John Wendt, Appellant, v. Servite Fathers, Appellee.
Gen. No. 43,816.

Opinion filed December 17, 1947. Rehearing denied December 29, 1947. Released for publication December 29, 1947.

HARRY S. GREENSTEIN and CHARLES C. & RICHARD M. SPENCER, all of Chicago, for appellant.

HINSHAW & CULBERTSON, of Chicago, for appellee; OSWELL G. TREADWAY, of Chicago, of counsel.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

The plaintiff, John Wendt, five years of age, was severely injured as the result of a fall from the unguarded roof of a wooden ticket office used as part of the St. Philip Stadium, which was owned and operated by the defendant, Servite Fathers, an Illinois corporation, organized for religious, educational and charitable purposes, in connection with its school. His suit for damages was predicated on the theory that the roof of the wooden structure constituted an attractive nuisance, to which he and his playmates had access by means of adjoining bleacher steps, and that as a result of defendant's negligence in maintaining the structure in a "rotten, unsafe, unsecured and dilapidated condition" he fell to the pavement below and was injured. Defendant answered, averring that the stadium and other buildings on the premises did not constitute an attractive nuisance, denying the charges of negligence, and pleaded further that because of its eleemosynary character it was not liable to plaintiff. In his replication plaintiff admitted that Servite Fathers was a charitable institution but alleged that

it was nevertheless liable in that it had prior to the accident acquired from Aetna Casualty Company of Hartford, Connecticut, a comprehensive general liability policy wherein the insurance company agreed to pay on behalf of defendant all sums not to exceed $10,000 for each person which it should become obligated to pay by reason of liability imposed on it for damages because of bodily injuries sustained by any person or persons caused by accidents on and about the premises in question, and that attached thereto was a special rider providing that: "1. the company . . . will not use, either in the adjustment of claims or in the defense of suits against the insured, the immunity of the insured from tort liability, unless requested by the insured to interpose such defense," and "2. the insured's . . . waiver of the defense of immunity shall not subject the company to liability for any portion of a claim, verdict or judgment in excess of the limits of liability stated in the policy." The replication further alleged that the provisions of the insurance policy created a fund separate and apart from the trust fund of the eleemosynary institution to be used as compensation to any person or persons who might be injured by reason of any acts of negligence on the part of defendant in the maintenance and operation of its stadium and that "should liability be established with reference to the injuries alleged in plaintiff's complaint, . . . said plaintiff waives all right to levy his execution upon the real estate or other assets of the said defendant, Servite Fathers, a corporation." When the cause came on for hearing the trial judge, relying on *Piper v. Epstein*, 326 Ill. App. 400, held in effect that defendant was immune from liability and that the allegations of the complaint relative to indemnifying insurance did not create a liability where none existed. The court sustained defendant's motion to strike the replication and entered judgment dismissing the suit. Plaintiff has taken an appeal.

The question presented is whether immunity should be granted to a charitable corporation in Illinois which has protected its trust funds from tort liability by carrying insurance indemnifying it against negligence resulting in injury to others. Before discussing the *Piper* decision, *Parks v. Northwestern University,* 218 Ill. 381, which is invoked as the source in this State for the doctrine of absolute immunity enunciated in the *Piper* case, and other decisions, it will be helpful to review as briefly as possible the origin of that doctrine, its historical background, the various theories invoked by courts for its support, and the arguments employed for its total repudiation in some States and its modification in others. The most exhaustive opinions called to our attention and which cite substantially all the leading cases on the subject, are *President and Directors of Georgetown College v. Hughes* (1942), 130 F. (2d) 810, and *Andrews v. Y.M.C.A.* (1939), 226 Iowa 374, 284 N. W. 186. As pointed out by JUSTICE RUTLEDGE, the writer of the *Georgetown College* opinion, the foundation of immunity in this country is the dictum of LORD COTTENHAM in *Feoffees of Heriot's Hospital v. Ross* (1846), 12 Clark & Fin. 507, 8 Eng. Reprint 1508. Previously in *Duncan v. Findlater* (1839), 6 Clark & Fin. 894, 7 Eng. Reprint 934, the same judge had uttered a similar dictum which was followed in *Holliday v. St. Leonard* (1861), 11 C. B., N. S., 192. The dictum of *Duncan v. Findlater* was overruled by *Mersey Docks Trustees v. Gibbs* (1866), L. R. 1 H. L. 93, and the ruling of *Holliday v. St. Leonard* was reversed by *Foreman v. Mayor of Canterbury* (1871), L. R. 6 Q. B. 214. In this state of the English decisions Massachusetts adopted the repudiated rule of *Holliday v. St. Leonard* in *McDonald v. Massachusetts General Hospital* (1876), 120 Mass. 432, 21 Am. Rep. 529, and Maryland followed *Heriot's* case in *Perry v. House of Refuge* (1885), 63 Md. 20, 52 Am. Rep. 495. Apparently both courts acted in ignorance of the English reversal ten years before and "thus

resurrected in America a rule already dead in England, and thereby gave LORD COTTENHAM's dictum a new lease on life in the New World.'' In *Feoffees of Heriot's Hospital v. Ross,* George Heriot, jeweler of King James VI of Scotland and I of England, by his last will directed that the residue of his estate be devoted in perpetuity to the founding of a hospital in Edinburgh ''for the maintenance, relief, bringing up, and education of so many poor fatherless boys, freemen's sons of that town,'' as the means would provide. Ross was denied admission and recovered damages. In reversing the judgment the House of Lords seemingly regarded the hospital's governors as being technically and substantially trustees of an express trust. On that theory and the fact that the governors themselves were charged with violating the statute, there was a source of reparation in their pockets. It is significant, however, that LORD COTTENHAM and his associates did not purport to lay down a rule of absolute immunity; they treated the exemption of the hospital's funds as only an application of the well settled law of trusts. LORD COTTENHAM thought that the giving of damages would violate the trust purpose, and LORD CAMPBELL said it would pervert the intention of the donor.

Following the lead of Massachusetts, other courts in this country adopted the same rule. Some of them, however, fearful of a doctrine which placed charitable institutions above and beyond the law with respect to nonliability for their negligence, began to modify the rule, with the result that decisions have passed from full immunity, through varied qualifications of the rule, to total repudiation thereof in some States, and as JUSTICE RUTLEDGE said: ''The cases are almost riotous with dissent,'' assigning ''reasons . . . even more varied than results,'' bearing ''earmarks of law in flux'' and indicating ''something wrong at the beginning or that something has become wrong since then.''

The clear trend in all jurisdictions has been to extend the rule of *respondeat superior* so as to afford greater protection to the injured. In increasing measure *respondeat superior* has made business corporations, trustees and other fiduciaries, as well as executors, administrators, receivers and individuals liable for their own negligence in the administration and operation of the business or property committed to their control. 2 Scott, Trusts (1939), secs. 174, 201, 247 and 264; 3 (part 2) Bogert's Trusts and Trustees (1935), secs. 731–735; Restatement, Trusts (1935), secs. 174, 264; 63 L. R. A. 227. Immunity is the exception. "When an individual human being undertakes not simply an isolated act, but a habit or business of charity, without incorporating or casting it in the form of a trust, he does not acquire immunity. Possibly half the medical service rendered today is charity practice. So is a large share of legal service. Some physicians, and perhaps some lawyers, spend half or more of long and useful careers ministering to the sick and the troubled without pay. . . . Yet they do not have leave to be careless, notwithstanding their kindness is continuous or habitual rather than casual or occasional. . . . Only when an individual institutionalizes his charitable enterprise formally, as by incorporation or possibly by creating a trust, does he succeed in casting the whole burden of its negligent operation on those it injures." *Georgetown College v. Hughes, supra.*

The question of the liability of a charitable institution to respond in damages for the negligence of its servants and employees has been many times before the courts. There is not only an irreconcilable conflict of decisions but also a marked diversity of opinion among those of the courts which agree in their ultimate decision as to the character, reason or ground for so deciding. Charitable and eleemosynary institutions have claimed exemption not only upon the trust fund

theory, which was originally enunciated in *Heriot's* case, but also upon the nonapplicability of the rule of *respondeat superior,* the waiver theory, and on questions of public policy.

The reason for immunity given under the trust fund theory is that the trust fund might be wholly destroyed and diverted from the purpose for which it was given, thwarting the donor's intent, as the result of negligence for which he was in nowise responsible. The accompanying argument that it would discourage charitable donations which might be diverted to the payment of negligence claims, ''originated in a day when there were comparatively few charitable institutions apart from the great ecclesiastical organizations; . . . encouragement to those inclined to give or to create philanthropies was quite necessary; . . . ofttimes the charitable institutions were small with but meager funds. A single negligence action might have wiped them out. The same reasons do not pertain today. It would be rare indeed if any philanthropist would fail to give to a charitable use because he feared that the institution he created or contributed to might be sued for negligence and some of its funds required to compensate for negligence.'' *Sessions v. Thomas D. Dee Memorial Hospital Ass'n,* 94 Utah 460, 78 Pac. (2d) 645 (from concurring opinion of JUSTICE WOLFE.)

One of the early refinements of the trust fund theory was to refuse exemption from liability unless the charitable institution had shown due care in the selection of its servants and agents (*Old Folks' & Orphan Children's Home v. Roberts* (1930), 91 Ind. App. 533, 171 N. E. 10) but, as pointed out in *Andrews v. Y.M.C.A., supra,* ''Such an exception is wholly inconsistent with, and a repudiation of the trust fund doctrine, since an enforcement of the exception would, itself, effect a depletion of the trust fund. If the trust fund doctrine is sound, an institution, engaged in public charitable,

eleemosynary, or religious work, could not be held responsible in tort to any plaintiff, so far as trust property might be used to discharge the liability.''

The theory that the doctrine of *respondeat superior* is not applicable to charitable institutions is founded upon the argument that the rule has application only where the master derives some profit or advantage to himself from what his servant does, and since a charitable institution makes no profit from the endeavors of its servants the rule has no application to it, and therefore it is not responsible for their negligent acts. In *Hearns v. Waterbury Hospital,* 66 Conn. 98, 33 Atl. 595, the court speaks of the *respondeat superior* rule as at times a hard rule, but resting on public policy, and there held that it should not be extended to charitable institutions, but JUSTICE BLISS, in *Andrews v. Y.M.C.A.,* pertinently calls attention to the fact that "This ancient maxim of the common law and its twin—'Qui facit per alium facit per se'—He who acts through another acts by or for himself—form the basis of the law of agency, and of other principles in the law of master and servant. They are founded on the principle that a duty rests on every person, individual, or corporation, in the management of his or its affairs, whether personally or by agents and servants, so to conduct them as not to injure another, except on the penalty of answering in damages.''

Courts adopting the waiver theory argue that one who becomes a beneficiary of the charity does so on the implied assent or condition that the trust property is not available to him for compensation in the event of his injury through the negligence of the trustees or their servants. (*Powers v. Massachusetts Homeopathic Hospital* (1901), 109 F. 294; *Stonaker v. Big Sisters Hospital* (1931), 116 Cal. App. 375, 2 P. (2d) 520.) They say he assumes the risk in consideration of the gratuitous services rendered him. *Powers v. Massachusetts Homeopathic Hospital* (1901), *supra,*

was one of the earlier cases to announce this doctrine, and it was followed in numerous other decisions, including *Schloendorff v. Society of New York Hospital* (1914), 211 N. Y. 125, 105 N. E. 92; *Cook v. John N. Norton Memorial Infirmary* (1918), 180 Ky. 331, 202 S. W. 874; *Thomas v. German General Benev. Society* (1914), 168 Cal. 183, 141 Pac. 1186. This theory is purely fictitious and certainly cannot be applied to the many patients who are desperately ill or unconscious when admitted to a hospital or to infants and insane persons who have no legal capacity to so will away their rights, ''nor does the ordinary conscious adult intend to do so. Usually he is ill or hurt. He does not haggle about terms. He expects care, not carelessness. Few hospitals would announce a policy of requiring such a waiver as a condition of entrance, and few patients would enter under such a condition unless forced to do so by poverty. ·. . . The idea of waiver, therefore, as implied from reception of benefit amounts merely to imposing immunity as a rule of law in the guise of assumed contract or renunciation of right, when all other reasons are found insufficient to support the distinction.'' *Georgetown College v. Hughes, supra.*

Some authorities consider the theory of public policy as the frankest statement of the rationale of the decisions. *Andrews v. Y.M.C.A., supra.* Those supporting the theory say that it is better for the community and the public in general that the individual suffer and bear his loss rather than that the offending charitable institution should suffer in damages and so impair, theoretically at least, its ability to offer its charity on as wide a scale as possible. In the *Andrews* case the Iowa Hospital Association, which was allowed to intervene and file a brief subscribed to by 104 hospitals in Iowa, urged this consideration upon the court along with others. PROFESSOR BOGERT poses the question squarely by asking: ''Is the state so deeply in-

terested in fostering charities and maintaining the integrity of their funds that it will occasionally compel isolated individuals to bear pain and suffering and property loss without recompense in order that the good of the greater number shall be advanced? Is tort immunity still another of the many special privileges which charities are to receive from the courts and Legislatures?'' Bogert on Trusts and Trustees, vol. 2, ch. 20, sec. 401, pp. 1243–1244. The anomalous position of the remediless beneficiary of charity is difficult to justify, and as JUSTICE RUTLEDGE, in criticizing the retention of immunity in the case of the non-paying beneficiary, pointed out, ''He, least of all, is able to bear the burden. More than all others, he has no choice. He is the last person the donor would wish to go without indemnity.'' Hospitals and other charitable corporations can safeguard their trust funds by liability insurance, and many of them do so. Public policy ought to be as much concerned with safeguarding the rights of the many who require care as with the preservation of the trust funds of institutions that minister to them. ''The abolition of tort immunity would still leave charities in a preferred position when compared with private corporations. For example, the growth of charities is fostered by various exceptions to the rule against remoteness and to the rules against restraints on alienation and accumulations. [Citing Bogert, Trusts and Trustees, pars. 349, 350, 353.] Moreover, in their taxation policies, legislatures favorably regard gifts and legacies to charities, as well as the property owned by charities. The costs of these advantages are spread over the entire community, while the rule of tort immunity places the loss squarely on a single individual. Clearly, charitable corporations should, as do private corporations, bear the cost of their tortious acts, and the rule of tort immunity which leaves an undeserved loss on an unfortunate individual should be abolished.'' 10 University of Chicago Law Review (1942–43), pp. 215, 216.

Courts, basing their conclusions upon one or another of these various theories, have either adopted exemption from liability, modified the theory or repudiated it altogether. Some States appear to have no decisions on the subject. Others adhere to "full immunity" with exceptional liabilities. *Maretick v. South Chicago Community Hospital* (1938), 297 Ill. App. 488; *Parks v. Northwestern University* (1905), 218 Ill. 381; *Johnston v. Chicago* (1913), 258 Ill. 494; *Roosen v. Peter Bent Brigham Hospital* (1920), 235 Mass. 66, 126 N. E. 392; and *McDonald v. Massachusetts General Hospital* (1876), 120 Mass. 432, 21 Am. Rep. 529. In some of these States the exemption is not from judgment, but from execution. Three or four States have imposed unqualified liability. These include New York, which did so, as JUSTICE RUTLEDGE said, "after tortuous efforts to find a satisfactory intermediate stopping place." McCaskill, Respondeat Superior as Applied in New York to Quasi-Public and Eleemosynary Corporations (1920), 5 Corn. L. Q. 409, 6 Corn. L. Q. 56; *Dillon v. Rockaway Beach Hospital & Dispensary* (1940), 284 N. Y. 176, 30 N. E. (2d) 373; *Borwege v. City of Owatonna* (1933), 190 Minn. 394, 251 N. W. 915; *Welch v. Frisbie Memorial Hospital* (1939), 90 N. H. 337, 9 A. (2d) 761. England, Canada and New Zealand have adhered to their position of imposing liability since *Mersey Docks Trustees v. Gibbs* (1866), L. R. 1 H. L. 93. In seven States strangers and paying beneficiaries may recover, but the question has been reserved as to nonpaying ones. *Silva v. Providence Hospital* (1939), 14 Cal. (2d) 762, 97 P. (2d) 798; *Gable v. Salvation Army* (1940), 186 Okla. 687, 100 P. (2d) 244; and *Sessions v. Thomas D. Dee Memorial Hospital Ass'n* (1938), 94 Utah 460, 78 P. (2d) 645. Colorado and Tennessee impose liability if the charity is protected by insurance (*O'Connor v. Boulder Colorado Sanitarium Ass'n* (1939), 105 Colo. 259, 96 P. (2d) 835; *Vanderbilt University v. Henderson*

(1938), 23 Tenn. App. 135, 127 S. W. (2d) 284). In Louisiana the plaintiff may sue the insurance company directly and the defense of charity is not available. *Lusk v. U. S. Fidelity & Guaranty Co.* (La. App. 1941), 199 So. 666. Some of these States, together with Georgia and others, apply liability to the extent of the property owned by the corporation and used not directly in carrying on the charitable enterprise but for business purposes to produce income for its support. *Robertson v. Executive Committee of Baptist Convention* (1937), 55 Ga. App. 469, 190 S. E. 432; *Baptist Memorial Hospital v. Couillens* (1940), 176 Tenn. 300, 140 S. W. (2d) 1088. The trend in these latter States is clearly toward unqualified responsibility. JUSTICE ROBINSON, concurring in *Miller v. Sisters of St. Francis* (1940), 5 Wash. (2d) 204, 105 Pac. (2d) 32, prophetically remarked that "the next generation of judges will surely abandon the rule [of immunity] if we do not." Thus apparent preponderance supporting immunity is, to say the least, extremely doubtful, and it is significant that although courts are in disagreement as to whether and to what extent immunity should be allowed, opinion among scholars outside the courts almost uniformly supports liability against immunity. Scott, Trusts (1939), sec. 402; Harper, Torts (1933), sec. 294; Prosser, Torts (1941), 1079; Appleman, The Tort Liability of Charitable Institutions (1936), 22 A. B. A. J. 48; Feezer, The Tort of Charities (1928), 77 U. of Pa. L. Rev. 191; Notes (1925) 34 Yale L. J. 316; 14 Boston U. L. Rev. 477 (1934); 22 Va. L. Rev. 58 (1935); 48 Yale L. J. 81 (1938); 21 Chicago Kent-Law Review (1943) 256; 10 University of Chicago Law Review (1942–1943) 211.

If this question were one of first impression we should be inclined to hold with *Georgetown College v. Hughes* that continued protection of charitable corporations from tort liability is justified by neither theory nor public policy, and with the position taken

by the Circuit Court of Appeals of the Second District (JUSTICES LEARNED HAND, THOMAS W. SWANN and AUGUSTUS N. HAND), which in passing on the right of plaintiff who was injured in a collision with the negligently driven ambulance of a hospital (*Henry W. Putnam Memorial Hospital v. Allen* (1929), 34 F. (2d) 927), made the following pertinent observation: "we have no difficulty in deciding that irresponsibility should not be extended to the tortious infliction of damage upon strangers. To hold that a charitable institution, whose agent negligently runs down a pedestrian upon the street, need not respond in damages, although the circumstances are such as would render any other defendant liable, seems to us a *monstrous* doctrine. It is true that several courts of high authority have gone to this extreme. . . . But in our opinion no adequate reason has been, or can be, advanced for allowing the purpose of the settlor of trust funds to introduce into the law a principle which, to us, appears *so anomalous and so unjust*. We prefer the reasoning of cases which have applied the ordinary rules of liability to such a situation as is now before the court." (Italics ours.) However, as a court of intermediary appeal we are bound to apply the doctrine enunciated in *Parks v. Northwestern University* (1905), whenever the facts require it, but we should certainly be reluctant to extend the rule beyond the scope of the *Parks* decision.

Illinois is listed among the States which grant unqualified immunity. This status dates back to *Parks v. Northwestern University,* which has been cited by the Supreme and Appellate Courts of this State, under varying circumstances, for more than 40 years. It holds that "the doctrine of *respondeat superior* does not extend to charitable institutions for the reasons, 'first, that if this liability were admitted the trust fund might be wholly destroyed and diverted from the purpose for which it was given, thus thwart-

ing the donor's intent, as the result of negligence for which he was in nowise responsible; second, that since the trustees cannot divert the funds by their direct act from the purposes for which they were donated, such funds cannot be indirectly diverted by the tortious or negligent acts of the managers of the funds or their employees.' '' ·(Citing 5 Am. & Eng. Ency. of Law, 2d ed., 923.) Amplifying the ground on which these conclusions were predicated, the court said that ''an institution of this character, doing charitable work of great benefit to the public without profit, and depending upon gifts, donations, legacies and bequests made by charitable persons for the successful accomplishment of its beneficial purposes, is not to be˙hampered in the acquisition of property and funds from those wishing to contribute and assist in the charitable work, by any doubt that might arise in the minds of such intending donors as to whether the funds supplied by them will be applied to the purposes for which they intended to devote them, or diverted to the entirely different purpose of satisfying judgments recovered against the donee because of the negligent acts of those employed to carry the beneficent purpose into execution.'' As heretofore indicated, we think this argument for sustaining immunity because of the intent of the donor and the danger of destroying or. preventing the creation of charitable institutions no longer has, if ever it had, compelling· effect. ''Changes in the law and in the organization and mores of community life have taken away their major force. That is true, whether for full or modified immunity.'' (*Georgetown v. Hughes.*) And it is a matter of common knowledge that charitable institutions still flourish in Great Britain, Canada, New York, California, Florida, Minnesota and the District of Columbia, where the doctrine of immunity has been abandoned. When cogent reasons for abandoning a doctrine no longer require its continuation, courts should not hesitate

to depart from it. This is especially true where ''The fault in the foundation accounts in part for the weakness later disclosed in the structure erected on it.'' *Georgetown v. Hughes.* No better example of this can be found than in *Erie R. Co. v. Tompkins,* 304 U. S. 64 (1938), where the Supreme Court overruled *Swift v. Tyson,* 41 U. S. 1 (1842), which had been followed consistently for nearly 100 years, with the pertinent comment that ''experience in applying the doctrine of *Swift v. Tyson,* had revealed its defects, political and social; and the benefits expected to flow from the rule did not accrue.''

*Myers v. Y.M.C.A. of Quincy* (1942), 316 Ill. App. 177, and *Piper v. Epstein, supra,* are the only two decisions in this State where immunity was granted to charitable corporations which were protected by liability insurance. In the former case the basis for the decision was that it would be improper to inform the jury that defendant was insured against liability since ''the question whether defendant has someone to help him pay in whole or in part any judgment rendered against him has nothing to do with the merits of the case and to bring it into the law suit imports an influence that could only serve to aid the plaintiff at the expense and prejudice of the defendant,'' citing *Kavanaugh v. Parret,* 379 Ill. 273, *Smithers v. Henriquez,* 368 Ill. 588, *Mithen v. Jeffery,* 259 Ill. 372, wherein the court discussed the proper latitude in examining jurors on their *voir dire* where a defendant, not a charitable corporation, is protected by liability insurance. The fears expressed by the court in the *Myers* case are unfounded. If the allegation of the existence of insurance be properly made, as it was in the case at bar, the issue would not be presented for the consideration of the jury unless the fact of insurance were denied by the charitable corporation; and if the fact of insurance were not controverted by defendant's answer the issue would never be brought to the attention of

the jury since the complaint in Illinois does not go to the jury room.

In *Piper v. Epstein* the liability of a hospital, conceded to be a charitable corporation and which carried indemnifying insurance, was involved. The court, relying on the trust fund doctrine announced in *Parks v. Northwestern University* and various other decisions in Illinois and elsewhere, concluded that the holding in the *Parks* case "has been followed in an unbroken line of decisions. The exemption from liability is absolute. The rule of *respondeat superior* is not applicable to charitable institutions, and there is no basis for a judgment against them. The policy here involved insures the defendant hospital only against liability imposed by law. It was procured to protect the hospital, not to enlarge its liability. . . . To hold the hospital liable because it carried this protection is to create a new liability and a new contract between the insurer and the insured," and the court accordingly reversed judgment as to the hospital.

We find nothing in *Parks v. Northwestern University* which would justify the conclusion that the exemption from liability is absolute. As already pointed out, the only basis for the court's conclusion in the *Northwestern* case was that if liability were admitted the trust fund might be diverted from the purpose for which it was given, thus thwarting the donor's intent. The case goes no further than that. It does not hold or employ any language indicating that "the exemption from liability is absolute," and it is fair to assume that the court would not have denied liability if the only reason which it assigned for doing so, namely, the diversion of the trust fund, had not existed.

In the case at bar Servite Fathers wished to protect those who might be injured through its negligence or that of its agents or servants, by taking out a liability insurance policy which expressly stipulated

that the insurance company, either in the adjustment of claims or in the defense of suits against the insured, should not interpose the defense of immunity unless requested by the insured to do so. There is nothing in the record to indicate that any such request was made. This procedure was commendable and evidently in conformity with the policy of the Catholic Bishop of Chicago to stipulate with insurance companies, when defending local Catholic charities, not to interpose the defense of immunity as in *Kos v. Catholic Bishop of Chicago,* 317 Ill. App. 248, where immunity would have been a valid defense, but was not invoked. The immunity doctrine was devised for the benefit of the charitable corporation, and if the corporation wishes to waive immunity we know of no principle in law which would prevent it from doing so. To hold that the exemption from liability is "absolute" and that a hospital or charitable institution may not protect its beneficiaries as well as itself by insurance because it creates a new liability where none existed is to extend the doctrine far beyond *Parks v. Northwestern University* or any other decision in this State. If the absolute immunity rule enunciated in the *Piper* case were to prevail, it would seem a sheer waste of money for a charitable corporation to purchase insurance protection. We hold that where insurance exists and provides a fund from which tort liability may be collected so as not to impair the trust fund, the defense of immunity is not available.

For the reasons indicated the judgment of the circuit court is reversed and the cause remanded with directions to try the case on its merits.

*Judgment reversed and cause remanded with directions.*

SCANLAN and SULLIVAN, JJ., concur.