SECOND DIVISION
November 13, 207

No. 1-06-3550

| | | |
|---|---|---|
| TERRY HUDSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | No.  04 L 4449 |
| YMCA OF METROPOLITAN CHICAGO LLC, a Not-for- | ) | |
| Profit Illinois Corporation, d/b/a Rich Port YMCA, | ) | Honorable |
| | ) | Jeffrey Lawrence, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

This appeal arises from an order of the trial court granting partial summary judgment to defendant YMCA of Metropolitan Chicago, LLC., d/b/a Rich Port YMCA (the YMCA), in plaintiff Terry Hudson's personal injury action against the YMCA.  On April 19, 2004, plaintiff was performing community service at the YMCA's Rich Port facility as part of his plea agreement for a criminal offense when scaffolding on which he was standing tipped over.  He sued the YMCA for his resulting injuries, alleging negligence and wilful and wanton misconduct.  The court granted partial summary judgment to the YMCA on plaintiff's negligence claim, finding the YMCA immune from tort liability under section 1(e) of the Probation Community Service Act (730 ILCS 115/1(e) (West 2006)).  The court denied plaintiff's motion for reconsideration and made its order final and appealable on November 22, 2006.

Plaintiff timely appeals the court's order denying his motion for reconsideration, arguing the court erred in entering summary judgment for the YMCA on his negligence claim because the section 1(e) immunity (1) extends only to funds other than the YMCA's liability insurance coverage and (2) violates the equal protection clauses of the United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2). We have jurisdiction to consider the appeal pursuant to Supreme Court Rules 301 (155 Ill. 2d R. 301) and 303 (210 Ill. 2d R. 303). We affirm.

Waiver of Immunity

Plaintiff first asserts the court erred in granting summary judgment to the YMCA on his negligence claim because, by acquiring tort liability insurance coverage, the YMCA waived its section 1(e) tort immunity to the extent of that coverage. This issue concerns matters of summary judgment and statutory construction, both of which we review *de novo*. *Elsbury v. Stann & Associates*, 371 Ill. App. 3d 181, 185, 861 N.E.2d 1031, 1035 (2006).

Section 1(e) provides:

"*Neither the State, any* local government, probation department, public or *community service program or site*, nor any official, volunteer, or employee thereof acting in the course of their official duties *shall be liable for any injury or loss a person might receive while performing public or community service as ordered* either (1) *by the court* or (2) by any duly authorized station or probation adjustment, teen court, community mediation, or other administrative diversion

program authorized by the Juvenile Court Act of 1987 *for a violation of a penal statute of this State* or a local government ordinance (whether penal, civil, or quasi-criminal) *or for a traffic offense*, nor shall they be liable for any tortious acts of any person performing public or community service, *except for wilful, wanton misconduct or gross negligence on the part of such* governmental unit, probation department, or public or *community service program or site* or on the part of the official, volunteer, or employee."  (Emphasis added.)  730 ILCS 115/1(e) (West 2006).

It is uncontested that plaintiff suffered his injuries while performing community service at a YMCA community service site by court order for a criminal offense.  Therefore, unless the YMCA engaged in wilful and wanton misconduct or was grossly negligent, the YMCA is not liable for any injury plaintiff sustained and the trial court properly granted summary judgment to the YMCA on plaintiff's negligence claim.  See *Petty v. Crowell*, 306 Ill. App. 3d 774, 715 N.E.2d 317 (1999) (affirming dismissal of negligence action against municipality pursuant to section 5-5-7 of the Unified Code of Corrections (730 ILCS 5/5-5-7 (West 1994)), a provision identical to section 1(e); court held, barring allegations of wilful and wanton misconduct or gross negligence, municipality and its employees were immune from liability for injuries caused or sustained by court-ordered community services participants).

However, the YMCA carried an insurance policy with a $1 million liability limit and $2 million general aggregate.  Looking to common law, plaintiff argues public

policy favors compensating a tort victim where insurance protects public or charitable funds and, therefore, where a public or charitable entity has chosen to take out liability insurance coverage, the entity has waived immunity, whether statutory or common law, to the extent of the insurance coverage. He asserts that the section 1(e) immunity is not absolute and extends only to funds beyond those covered by liability insurance coverage, *i.e.*, that the immunity extends only to the YMCA's charitable funds unprotected by the $1 million insurance coverage and cannot be invoked to protect the insurance carrier.

Under the common law "charitable immunity doctrine," a charitable institution was absolutely immune from tort liability, the courts' reasoning being that a charity's trust funds should be protected and paying damages from those funds would divert the funds from the purpose for which they were given. See generally *Moore v. Moyle*, 405 Ill. 555, 558-60, 92 N.E. 81, 83-84 (1950)*; Wendt v. Servite Fathers*, 332 Ill. App. 618, 621-32, 76 N.E.2d 342, 343-48 (1947). Over time, in cases where a charitable or governmental entity carried indemnifying liability insurance, courts developed the "waiver of immunity" doctrine, holding that the charitable or governmental entity's common law immunity was not absolute if trust funds were protected and that, by buying liability insurance, the entity waived immunity to the extent of the insurance coverage because public policy favored compensating tort victims for their injuries and insurers should not be able to avoid their obligations by hiding behind a curtain of immunity. *Moore*, 405 Ill. at 563-66, 92 N.E. at 86-87; *Wendt*, 332 Ill. App. at 634, 76

4

N.E.2d at 349*; Beach v. City of Springfield*, 32 Ill. App. 2d 256, 260-61, 177 N.E.2d 436, 438-39 (1961). The charitable immunity doctrine was abrogated by our supreme court in 1965. *Darling v. Charleston Community Memorial Hospital,* 33 Ill. 2d 326, 337, 211 N.E.2d 253, 260 (1965) ("the doctrine of charitable immunity can no longer stand"), following *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11, 163 N.E.2d 89 (1959).

Plaintiff recognizes that the charitable immunity doctrine was abolished but argues that this does not necessarily constitute abolition of the waiver of immunity doctrine. He asserts the two doctrines rest on entirely different public policy considerations: the charitable immunity doctrine sought to protect the trust funds of charities while the waiver of immunity doctrine seeks to protect tort victims when charitable institutions were protected by insurance. He argues that abrogating the charitable immunity doctrine and supplanting it with statutory immunities does not eradicate the public policy favoring protection of tort victims where insurance coverage exists and that the waiver of immunity doctrine reflecting that policy should be applied in interpreting section 1(e).

Plaintiff bolsters this argument by comparing the language in section 1(e) with that in section 9-103 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/9-103 (West 2006)) (Tort Immunity Act). Section 9-103(a) of the Tort Immunity Act provides in pertinent part that a local public entity can protect itself from liability by taking out insurance. 745 ILCS 10/9-103(a) (West 2006). Section

9-103(c) of the Tort Immunity Act then provides that any insurance company which provides coverage to a local public entity "shall utilize any immunities or may assert any defenses to which the insured public entity or its employees are entitled." 745 ILCS 10/9-103(c) (West 2006). Section 1(e) does not contain a similar provision authorizing an insurer to assert its insured's immunities. Plaintiff argues that, in the absence of such a legislative directive, strict construction of section 1(e) demands that an insurer cannot assert the section 1(e) statutory immunity because the common law waiver of immunity doctrine abrogating immunity to the extent of coverage by liability insurance must apply. He asserts that legislative abrogation of the waiver of immunity, *i.e.*, reading language similar to that in section 9-103(c) of the Tort Immunity Act into section 1(e) to provide absolute immunity regardless of the existence of liability insurance, would be in derogation of both public policy and common law and section 1(e) should, therefore, be narrowly and strictly construed.

Statutes should be construed to ascertain and give effect to the legislature's intent. *Moore v. Green*, 219 Ill. 2d 470, 479, 848 N.E.2d 1015, 1020-21 (2006). Statutory language must be afforded its plain, ordinary, popularly understood meaning and, unless such language is ambiguous, a statute must be applied as written without resorting to other aids of construction. *Moore*, 219 Ill. 2d at 479, 848 N.E.2d at 1020-21. We will not read into a statute exceptions, limitations and conditions that the legislature did not express. *Petersen v. Wallach*, 198 Ill. 2d 439, 446, 764 N.E.2d 19, 23 (2002).

The plain language of section 1(e) makes no mention of any legislative intent that the existence of liability insurance operates as a waiver of immunity to the extent of that insurance. Putting aside the question of whether the waiver of immunity doctrine survived abrogation of the charitable immunity doctrine, reading section 1(e) in conjunction with section 9-103 of the Tort Immunity Act does not lead us to find otherwise and we decline to read into section 1(e) an exception to immunity based on the existence of insurance coverage.

The Tort Immunity Act and section 1(e) of the Probation Community Service Act both concern the grant of immunities. However, unlike section 1(e), the Tort Immunity Act specifically provides that the local public entity can take out insurance to protect itself from tort liability or loss. 745 ILCS 10/9-103(a) (West 2006). The legislature recognized that there could be instances in which immunities granted to a public entity, including those granted under the Tort Immunity Act, might not protect that entity from liability, for example, where a willful and wanton misconduct exception exists. It, therefore, provided a means for the public entity to protect its assets from liability while at the same time providing a source of recovery to the injured party by allowing the entity to acquire liability insurance coverage. Allowing the public entity to acquire such insurance coverage was not in any way a legislative directive that any immunity to which the entity was entitled should be considered waived to the extent the entity took out liability insurance. This is clear from the fact that the legislature then directed that insurers could claim the immunities and defenses to which their insureds are entitled,

7

unless the local public entity acted officially or contracted to waive an immunity. 745 ILCS 9-103(c) (West 2006).

Statutory immunities are generally considered absolute unless the legislature provided language expressly limiting the scope of the immunity. *Jost v. Bailey,* 286 Ill. App. 3d 872, 878-79, 676 N.E.2d 1033, 1037 (1997). In section 1(e), the immunity is absolute except to the extent the governmental or charitable entity engaged in willful and wanton misconduct or was grossly negligent. 730 ILCS 115/1(e) (West 2006). However, as discussed previously, courts have historically limited seemingly absolute common law immunities pursuant to the waiver of immunity doctrine, holding immunities are not absolute where insurance can cover damages. The legislature was presumptively aware of the waiver of immunity doctrine and its underlying public policy in favor of compensating tort victims where insurance exists when it enacted and subsequently amended section 9-103 of the Tort Immunity Act. See generally *Callahan v. Edgewater Care & Rehabilitation Center, Inc.*, 374 Ill. App. 3d 630, 872 N.E.2d 551, 554 (2007). Indeed, the section 9-103(a) provision allowing a public entity to retain liability insurance could be seen as legislative incorporation of the waiver of immunity doctrine and its limit on immunity. This is especially true given that, until November 1986, section 9-103(c) read:

> "Every policy for insurance coverage issued to a local public entity shall
> provide or be endorsed to provide that the company issuing such policy waives
> any right to refuse payment or to deny liability thereto within the limits of said

8

policy by reason of the non-liability of the insured public entity for the wrongful or negligent acts of itself or its employees and its immunity from suit by reason of the defenses and immunities provided in this Act." Ill. Rev. Stat. 1985, ch. 85, par. 9-103(c).

However, effective November 25, 1986, the legislature amended section 9-103(c) by Public Act 84-1431 (Pub. Act 84-1431, eff. November 25, 1986), eliminating the requirement that an insurer waive any claim to the immunities of its insured and specifically allowing insurers to claim those immunities. Ill. Rev. Stat. 1985, ch. 85, par. 9-103(c) (now 745 ILCS 10/9-103(c) (West 2006)). By this clear statement, the legislature eliminated any inference that it adopted the waiver of immunity doctrine or that it intended the provision allowing an entity to retain insurance to affect the entity's immunity. By amending section 9-103(c), the legislature made a clear statement that insurance coverage makes no difference to the extent of a public entity's immunity.

Section 1 did not present the same legislative concern as section 9-103. It did not provide that a public or charitable entity may take out insurance to protect itself from tort liability. Accordingly, any immunity granted by section 1(e) was not called into doubt by an implied recognition of the waiver of immunity doctrine by the legislature, and there was no need for the legislature to clarify that insurers may assert an insured's immunities notwithstanding the existence of insurance. As with all other statutory immunities, given that section 1 contains no language leading to a contrary conclusion, it must be presumed that the immunities granted in section 1(e) are

absolute except for the specified exceptions for wilful and wanton misconduct or gross negligence by the charitable entity. Section 9-103(c) makes clear that the legislature did not intend to incorporate the waiver of immunity doctrine into our legislative scheme and there is no reason to read such into section 1, or any other statute for that matter.[1] Had the legislature intended that the waiver of immunity doctrine apply in section 1, it could have provided so expressly or, following plaintiff's line of reasoning, provided that a charitable entity may acquire liability insurance without including the instruction that an insurer may claim its insured's immunities. It did not do so. Accordingly, by acquiring liability insurance coverage, presumably to insure itself against claims by plaintiffs other than community service workers, the YMCA did not waive its section 1(e) statutory immunity to the extent of that insurance coverage.

Violation of Equal Protection Clauses

Plaintiff also argues that the court erred in granting summary judgment to the YMCA on his negligence claim because section 1(e) violates the equal protection clauses of the Illinois and United States Constitutions. The analysis used to assess

---

[1] Taking plaintiff's argument to its ultimate conclusion, he is essentially arguing that any statutory grant of immunity is not absolute where the public or charitable entity has bought liability insurance coverage and the legislature has not specified within the grant of immunity that any insurer providing such liability coverage may claim the insured's immunities or defenses.

equal protection claims is the same under both the United States and Illinois Constitutions. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322, 664 N.E.2d 1024, 1028 (1996). The equal protection guarantee requires that the government treat similarly situated individuals in a similar manner. *Jacobson,* 171 Ill. 2d at 322, 664 N.E.2d at 1028. Although the guarantee does not preclude the state from enacting legislation that draws distinctions between different categories of people, it does prohibit the state from according different treatment to persons who have been placed by a statute into different classes on the basis of criteria wholly unrelated to the purpose of the legislation. *Jacobson,* 171 Ill. 2d at 322, 664 N.E.2d at 1028.

Plaintiff argues section 1(e) violates the equal protection guarantee because it treats similarly situated individuals differently on the basis of criteria wholly unrelated to the purpose of the legislation. He defines the class of similarly situated individuals as "injured plaintiffs," and asserts class members are treated differently depending on whether the injured plaintiffs "happen to be community service workers." This legislative classification, a person injured while performing community service, affects neither fundamental rights nor makes a suspect classification, and we, therefore, employ a rational basis test to review plaintiff's equal protection claim. *Jacobson,* 171 Ill. 2d at 323, 664 N.E.2d at 1029; *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 86, 783 N.E.2d 1024, 1038 (2002). Whether a rational basis for a classification exists is a question of law, which we consider *de novo*. *Jacobson,* 171 Ill. 2d at 323, 664 N.E.2d at 1029.

11

1-06-3550

Under the rational basis test, our review is limited and deferential. *People v. Cully*, 286 Ill. App. 3d 155, 163, 675 N.E.2d 1017, 1024 (1997). Legislation carries a strong presumption of constitutionality, and if any set of facts can reasonably be conceived to justify the challenged classification, it must be upheld. *Jacobson,* 171 Ill. 2d at 324, 664 N.E.2d at 1029. If a statute's construction is doubtful, we will resolve those doubts in favor of its validity. *Rockford Memorial Hospital v. Department of Human Rights*, 272 Ill. App. 3d 751, 763, 651 N.E.2d 649, 659 (1995). The rational basis test "requires only that there be a reasonable relationship between the challenged legislation and a conceivable, [even though] unarticulated, governmental interest." *Cutinello v. Whitley*, 161 Ill. 2d 409, 420, 641 N.E.2d 360, 365 (1994). For purposes of rational basis review, the equal protection clause does not demand that the legislature actually state at any time the purpose or rationale supporting its classification. *Nordlinger v. Hahn*, 505 U.S. 1, 15, 120 L. Ed. 2d 1, 15-16, 112 S. Ct. 2326, 2334 (1992). A legitimate state purpose may be ascertained even where administrative or legislative history is silent. *Nordlinger*, 505 U.S. at 15, 120 L. Ed. 2d at 16, 112 S. Ct. at 2334.

A classification scheme must rationally advance an identifiable and reasonable governmental objective, a purpose that could conceivably or reasonably have been the purpose and policy of the legislature. *Nordlinger*, 505 U.S. at 15, 120 L. Ed. 2d at 16, 112 S. Ct. at 2334. Therefore, in determining whether section 1(e) survives rational basis scrutiny, we must first identify a legitimate government purpose or goal which the

12

legislature could have been pursuing.  Whether the conceived reason actually motivated the legislature in enacting section 1(e) is entirely irrelevant.  *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315, 124 L. Ed. 211, 222, 113 S.Ct. 2096, 2102 (1993).  Once such a purpose has been identified, we must determine whether a conceivable rational basis exists for the legislature to believe section 1(e) would further the hypothesized purpose.

Plaintiff asserts that section 1(e) is part of the Unified Code of Corrections (Code) (730 ILCS 5/1-1-1 *et seq.* (West 2006)) and that the effect of the section 1(e) immunity is not to advance the fundamental purpose of the Code and of community service to assist criminal offenders to become stable and productive citizens but, rather, to deprive an injured offender of the compensatory damages he needs in order to avoid living a life of poverty on disability insurance paid for by the taxpayers.  The Unified Code of Corrections is codified in Chapter 730, Act 5 of the Illinois Compiled Statutes.  730 ILCS 5/1-1-1 *et seq.* (West 2006).  Section 1-1-2 of the Code provides that the Code's purposes, in salient part, are to "(a) prescribe sanctions proportionate to the seriousness of the offenses and permit the recognition of differences in rehabilitation possibilities among individual offenders; * * * and (d) restore offenders to useful citizenship."  730 ILCS 5/1-1-2 (West 2006).  Consistent with the legislature's intent to rehabilitate an offender, if possible, and restore him to useful citizenship, the Code provides rehabilitative provisions such as community service and substance abuse treatment as conditions of probation.  *People v. Moss*, 217 Ill. 2d 511, 532, 842

N.E.2d 699, 712 (2005); 730 ILCS 5/5-6-3 (West 2004).

Section 1(e) concerns community service. It is part of the Probation Community Service Act, which authorizes Illinois county boards and probation departments to develop programs of public and community service. 730 ILCS 115/0.01 (West 2006). Providing a program of community service to offenders would seem to advance the Code's purpose to rehabilitate an offender and restore him to useful citizenship. Community service allows an offender to be held accountable for his crime without having to endure incarceration. Besides the obvious benefit to the state when an offender does not need to be housed, fed and otherwise cared for in a prison, community service also benefits the offender. It allows an offender to remain free. It allows him to repay the community for his offense, to take responsibility for his actions and make amends by providing a valuable service to the community. Rather than keeping an offender isolated in prison, community service aids in rehabilitating an offender and restoring him to active citizenship by integrating him into the community, providing role models and training for his future development and making him feel a connection and responsibility to that community.

However, although section 1(e) concerns community service, it is not part of the Code. Section 1(e) is in the Community Service Probation Act. As is the Code, the Community Service Probation Act is codified in Chapter 730 of the Illinois Compiled Statutes. But it is in Act 115, not in the Code's Act 5. 730 ILCS 115/0.01 *et seq.* (West 2006). Acts within a chapter are separate, albeit under the same legislative scheme.

Even though Chapter 730 is titled "Corrections," the acts encompassed by Chapter 730 are not all part of the Unified Code of Corrections. Only Act 5 comprises the Unified Code of Corrections. Accordingly, it is the purpose of the Probation Community Service Act, not of the Unified Code of Corrections, that we must consider primary in our equal protection analysis.

The Probation Community Service Act is "[a]n Act to authorize the county boards of the several counties in Illinois and the various probation departments thereof to develop programs of public and community service." 730 ILCS 115/0.01 (West 2006). The act authorizes the county boards, in cooperation with the circuit courts, " to establish and operate agencies to develop and supervise programs of public or community service for those persons placed by the court on probation, conditional discharge, or supervision." 730 ILCS 115/1(c) (West 2006). The obvious, albeit unarticulated purpose of the Probation Community Service Act, and section 1(e) in particular, is to create sufficient community service opportunities so that criminal offenders can serve their sentence in some manner besides imprisonment, presumably advancing the Code's stated goal to rehabilitate an offender and restore him to active citizenship.

In order that community service be a viable sentencing/rehabilitation option, public and charitable entities must be willing to accept community service workers. County boards cannot establish community service programs without public and charitable organizations willing to serve as community service sites. An organization

15

cannot be forced to serve as a community service site, with its attendant duty to report an offender's progress and his service to the court. 730 ILCS 115/1(a) (West 2006). It must agree to do so. 730 ILCS 115/1(a) (West 2006). The free labor an offender provides through community service might not outweigh the burden to the organization of monitoring, supervising and reporting on the offender and insuring against any injuries he may cause or suffer. Offering a public or charitable organization, such as the YMCA, immunity from liability for injuries suffered by a community service worker, barring wilful and wanton misconduct or gross negligence by the organization or its employees, if the organization agrees to serve as a community service site would seem to be an entirely reasonable way to entice more organizations to serve as community service sites. The organization is free from liability for ordinary negligence for injuries suffered by a community service worker, thus eliminating one worry about taking on a worker about which the organization presumably knows little and has had no hand in "hiring."[2] The equal protection clause prohibits arbitrary discrimination against a person or class. *Unzicker v. Kraft Food Ingredients Corp.*, 203 Ill. 2d 64, 86, 783 N.E.2d 1024, 1037-38 (2002). Here, section 1(e)'s purported discrimination against parties injured while performing community service is not arbitrary and is rationally

---

[2] "No person assigned to a public or community service program shall be considered an employee for any purpose, nor shall the county board be obligated to provide any compensation to such person." 730 ILCS 115/1(f) (West 2006).

16

related to section 1's overall legitimate purpose to create community service programs.

We recognize, as plaintiff points out, that the United States Supreme Court in *Richardson v. McKnight*, 521 U.S. 399, 138 L. Ed. 2d 540, 117 S. Ct. 2100 (1997), found the fact that private entities generally carry insurance sufficient to compensate tort victims one reason to hold that performance of a governmental function by a private entity is insufficient to justify application of tort immunity. *Richardson*, 521 U.S. at 410-11, 138 L. Ed. 2d at 551, 117 S. Ct. at 2106-07. However, the court's basis for this finding was that private liability insurance operated similarly to tort immunity to protect employees from liability for doing their jobs, thereby encouraging employees to perform their jobs without timidity because they did not have to be intimidated by fear of liability. *Richardson*, 521 U.S. at 410-11, 138 L. Ed. 2d at 551, 117 S. Ct. at 2106-07. *Richardson* is inapplicable here because (1) a charity is not performing a government function when it accepts a community service worker and (2) a community service worker is not an employee of the charity serving as his community service site (730 ILCS 115/1(f) (west 2006)) and thus not motivated by indemnifying insurance to perform his job properly.

Accordingly, there is good reason to treat parties injured while performing community service differently from other injured parties by barring them from recovery for ordinary negligence by an organization acting as a community service site. Without that immunity, organizations might not agree to accept community service workers, thereby thwarting the Probation Community Service Act's purpose of creating sufficient

community service programs to accommodate all the offenders sentenced to community service as a rehabilitative alternative to incarceration. As with any party injured on a community service site, a community service worker may still recover for injuries sustained through wilful and wanton misconduct or gross negligence by the charitable or public organization acting as the community service site, thus ensuring that the community service worker will not be mistreated and providing him recourse if he is. The legislature's distinction between the injured plaintiffs is not arbitrary. It is specifically intended to advance the legitimate purpose of the Probation Community Service Act and does not violate the equal protection clauses.

For the reasons stated above, we affirm the decision of the trial court granting summary judgment to the YMCA on plaintiff's negligence claim.

Affirmed.

HALL and SOUTH, JJ., concur.