LAWRENCE V. LINDROTH, M. D., PLAINTIFF-RESPOND-
ENT, v. CHRIST HOSPITAL, A CORPORATION OF NEW
JERSEY, DEFENDANT-APPELLANT, AND ELEVATOR
ENGINEERING CO., INC., DEFENDANT.

Argued May 14, 1956—Decided June 4, 1956.

*Mr. James P. Beggans* argued the cause for appellant (*Messrs. Carpenter, Bennett, Beggans & Morrissey,* attorneys; *Messrs. Elmer J. Bennett, Milton A. Dauber* and *Richard H. Hughes,* on the brief).

*Mr. David M. Klausner* argued the cause for respondent.

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. The decisions of the New Jersey courts presently confer an immunity upon charitable organizations and enterprises from liability in negligence to injured persons who are beneficiaries of their benefactions, but do not confer such immunity when the injured persons are strangers thereto.

Plaintiff suffered injuries from a fall in an elevator of defendant, Christ Hospital, a private charitable hospital, when the elevator malfunctioned due to the hospital's negligence. The hospital moved at the end of the case for a judgment in its favor upon the ground that the proofs showed as a matter of law that plaintiff was a beneficiary of the hospital's charity. The motion was denied and the jury was instructed to find upon the proofs whether the plaintiff's relation to the hospital was that of beneficiary or of stranger. The jury returned a verdict of $50,000 in plaintiff's favor. The hospital moved to set the verdict aside as excessive, and the motion was denied. The hospital appealed to the Appellate Division, alleging error in both actions of the trial court, and we certified the appeal here on our own motion.

The protection of charitable organizations from liability in damages for otherwise just claims arising from their negligence is losing support throughout the country. In the recently published second edition of his handbook on the law of torts Dean Prosser comments that the law conferring this immunity "is undergoing rapid change," largely influenced by the 1942 decision of the late Mr. Justice Rutledge in *President and Directors of Georgetown College v. Hughes, 76 U. S. App. D. C. 123, 130 F. 2d 810 (App. D. C. 1942)*, written while the Justice was a judge of the Court of Appeals of the District of Columbia. That "devastating opinion," says Dean Prosser, "reviewed all of the arguments in favor of the immunity and demolished them so completely as to change the course of the law," and was followed by "a flood of recent decisions holding that a charity is liable for its torts to the same extent as any other de-

fendant." The Dean lists 17 jurisdictions in addition to the District of Columbia where the immunity was formerly recognized and has now been repudiated. He concludes, "The immunity of charities is clearly in full retreat." *Prosser, Law of Torts* (*2d ed.* 1955), *pp.* 787, 789.

The plaintiff meets the hospital's attack upon the trial judge's denial of the motion for judgment by suggesting that New Jersey should be added to the list of jurisdictions repudiating immunity.

But the plaintiff is not a beneficiary of the hospital's benefactions and the hospital's attempt to interpose the cloak of immunity to defeat his claim cannot succeed. We therefore prefer to await an action squarely presenting the issue before deciding the proposition urged by the plaintiff.

Such immunity as exists under our cases originated 31 years ago with the decision of our former Court of Errors and Appeals in *D'Amato v. Orange Memorial Hospital,* 101 *N. J. L.* 61 (*E. & A.* 1925). There recovery was denied a patient of a charitable hospital for injuries suffered when she fell from a chair due to the negligence of a nurse who was transferring her from the chair to a bed. Patients were also denied recoveries in the more recent decisions in *Woods v. Overlook Hospital Ass'n,* 6 *N. J. Super.* 47 (*App. Div.* 1949); and *Rafferzeder v. Raleigh, etc., Memorial Hospital,* 33 *N. J. Super.* 19 (*App. Div.* 1954), although both opinions stated that the results were reached because the intermediate appellate court believed it was not at liberty to depart from the law laid down in the *D'Amato* case however contrary that law was to the impressive weight of authority elsewhere.

The limited scope of the immunity recognized by our decisions is best evidenced by the cases decided after *D'Amato.* The immunity was held to protect a private charitable hospital from liability to a mother injured while visiting her daughter at a hospital, *Boeckel v. Orange Memorial Hospital,* 108 *N. J. L.* 453 (*Sup. Ct.* 1932), affirmed 110 *N. J. L.* 509 (*E. & A.* 1933); another charitable hospital from liability to a student nurse receiving nursing instructions there,

*Casper v. Cooper Hospital,* 26 *N. J. Super.* 535 (*App. Div.* 1953); a church from liability to a student injured by a fellow pupil while both were in attendance at a church parochial school, *Jones v. St. Mary's Roman Catholic Church,* 7 *N. J.* 533 (1951), and a church from liability to a girl scout injured while attending a scout meeting in the church hall, *Bianchi v. South Park Presbyterian Church,* 123 *N. J. L.* 325 (*E. & A.* 1939). But the immunity was not a barrier protecting from tort liability a hospital sued by a member of a volunteer first aid squad injured at the hospital after bringing a patient into the hospital, *Kolb v. Monmouth Memorial Hospital,* 116 *N. J. L.* 118 (*E. & A.* 1936); hospitals sued by persons injured by the negligent operation of hospital vehicles on public highways, *Daniels v. Rahway Hospital,* 10 *N. J. Misc.* 585 (*C. P.* 1932), *Matthews v. Monmouth Memorial Hospital,* 131 *N. J. L.* 472 (*E. & A.* 1944); a church sued in like circumstances, *Simmons v. Wiley M. E. Church,* 112 *N. J. L.* 129 (*E. & A.* 1934); a hospital sued by a private nurse injured on hospital property while practicing her profession in the pay of a patient at the hospital, *Rose v. Raleigh Fitkin-Paul Morgan, etc., Foundation,* 136 *N. J. L.* 553 (*E. & A.* 1948); a church sued for injuries suffered in a church hall by a paying patron at a church social event, *Jewell v. St. Peter's Parish,* 10 *N. J. Super.* 229 (*Cty. Ct.* 1950).

The determinant whether the injured party's otherwise just tort claim against the charity may be defeated by an assertion of immunity from liability therefor is whether the person is one of the "recipients of the benefactions," one of the "beneficiaries of the charitable institution," rather than a person "unconcerned in and unrelated to that which the donor brought into being or supports in operations," *Rose v. Raleigh Fitkin-Paul Morgan, etc., Foundation, supra,* 136 *N. J. L.,* at *page* 555. Phrased otherwise in that opinion (136 *N. J. L.,* at *page* 556), the inquiry is whether the injured person was at the time of the mishap "a beneficiary of the charity in the legal sense" or "a stranger to

the charity." The plaintiff in that case was a graduate nurse of the hospital's nursing school and for that reason was among those listed upon the nurses' registry of the hospital which gave preference of employment to its graduates. Her employment for the hospital patient she was attending, at $49 per week paid by the patient, was the result of a call to the case made by the hospital's director of nurses from the nurses' registry. It was argued that her association with the hospital was therefore advantageous to her, so that she fell within the category of a beneficiary of the hospital's charity. The argument was rejected. It was held that if it was "of advantage to the nurse to be on the registry, it was perhaps of more advantage to the hospital to have nursing service available," particularly at that time of a shortage of nurses during the war years.

The plaintiff here was also a "stranger" to the charity of the defendant hospital. Indeed, this so fully appears from the uncontradicted facts that we question the trial judge's submission of the issue to the jury; at all events, the judge was clearly right in denying the hospital's motion for judgment in its favor.

The plaintiff is a surgeon on the hospital's staff. His connection with the hospital dates from his graduation from medical school in 1928. He served at the hospital progressively as an interne resident surgeon, assistant attendant in surgery, and since 1936 an attending surgeon and head of a surgery division. His surgical services to ward patients throughout these many years have been given without fee. By contrast, charges to such patients for other hospital services are paid to the hospital in whole or in part by the patients, or through hospitalization insurance or by public bodies. But plaintiff's free medical services to indigent hospital patients are not the only services he has rendered the hospital in furtherance of its mission to care for, nurture and maintain the sick, infirm, aged and indigent. Also advantageous to the furtherance of that end have been his services in various administrative capacities. He has been president of the medical staff, a medical advisory board

member, from time to time chairman of various staff committees, and a co-director of the hospital's cancer service. And because since 1939 he has held a degree as a member of the American College of Surgeons he has been able and qualified to act as the hospital's representative in its relations with that College and with the American Medical Association in respect of approvals of those associations necessary to the hospital. He has also participated in the teaching and training of internes and nurses of the hospital.

The hospital, conceding this, and conceding also the value of plaintiff's services in the furtherance of its charitable mission, insists, nevertheless, that plaintiff is in law a beneficiary of its charity because the proofs show that before the mishap his annual income from his surgical practice resulted in major part from fees received by him for surgical operations performed in the operating rooms of the hospital, the facilities of which were made available without cost to him (the fact is, however, that, while the plaintiff paid nothing for his use of the facilities, his patients paid certain fees to the hospital), and because the proofs show also that the distinction acquired by plaintiff as a surgeon is to be attributed primarily to the experience he gained and the researches he has been able to carry on because the hospital's facilities were available to him without charge.

The plaintiff is the originator of a widely publicized and well regarded surgical technique used in surgical operations to relieve high blood pressure. He achieved his prominence for this development following the appearance of his article in the *American Journal of Surgery* in 1947. That article became the basis of a syndicated news article reproduced widely by newspapers throughout this country and in many foreign lands. Many sufferers of high blood pressure have since retained his services for the performance of the operation by this technique, although he has continuously practiced general surgery and has always performed many other types of operations. The plaintiff admitted during his cross-examination that the work necessary to perfect his special technique, and which underlay his papers on the subject, was

done almost exclusively in the hospital's operating rooms using the hospital's facilities.

Doubtless the plaintiff did realize substantial advantage from his association with the hospital; but, equally, it cannot be questioned that the hospital's mission was substantially furthered by his membership on its staff, through the free surgical services rendered by him to ward patients, his administrative services in the various capacities mentioned, and in the dollar amounts received by the hospital from his private patients.

Fairly viewed, these proofs do not justify the classification of the plaintiff as a beneficiary of the hospital's charity. Such test as our decisions supply for differentiating a beneficiary from a stranger leans heavily upon the element whether the suitor is one of the *"direct* recipients of the charity's beneficence, an acceptor of its *benefactions,"* whose mishap occurs in the course of "some of the continuous ministrations to the *direct* beneficiaries of its charitable contributions"; the public policy sought to be served by the immunity doctrine is said to be "to avoid a diversion of trust funds from the *direct* object of their charitable donor by forbidding their application to damages for the negligence of the charity's servants *where the injured party participates in the charity's largesse," Daniels v. Rahway Hospital, supra,* 10 *N. J. Misc.,* at *pages* 587, 588. (Emphasis supplied.) In its emphasis upon the element whether the injured party is one whose connection with the charity is predominantly that of one who shares the benefits of the charity's mission, the test clearly excludes the plaintiff whose connection with the defendant hospital is not primarily as a recipient of the benefits of the hospital's mission, but rather that of a person who importantly contributed to the furtherance of that mission.

If, without access to the hospital's facilities, the plaintiff could not have attained the distinction he enjoys in his profession nor have been able to earn his livelihood in his surgical specialty, yet without his staff membership neither could the hospital have provided his free surgical services

to its ward patients over the years, nor have had his other services in furtherance of the advancement of its mission.

The situation is in nowise one of a clear-cut bestowal of hospital bounty upon a doctor and its receipt, without more, by him. It is more that of a mutual exchange under which the plaintiff has had the advantage of the hospital facilities to further his progress in his profession while earning his livelihood, the hospital exacting his services in return in furtherance of its charitable mission. In that posture of the proofs, the plaintiff is even more clearly a stranger to the hospital's benefactions than was the nurse who was allowed a recovery in *Rose v. Raleigh Fitkin-Paul Morgan, etc., supra.*

Our conclusion that the plaintiff cannot be considered a beneficiary of the charity's largess in these circumstances has the support of decisions of other jurisdictions. A number of the cases are collected in the comprehensive annotation at 25 *A. L. R. 2d*, 29, 91; see particularly *Marble v. Nicholas Senn Hospital Ass'n*, 102 *Neb.* 343, 167 *N. W.* 208 (*Sup. Ct.* 1918), where a doctor who brought a patient to a hospital to be x-rayed and was injured through the negligence of the operator of the x-ray machine was held to be a stranger to the charity.

█ Nor do we perceive any basis for disturbing the action of the trial judge in refusing to set aside the verdict as excessive. The standard of appellate review of such action is that laid down by *R. R.* 1:5–3, as interpreted in our decisions, namely, that, giving due regard to the action of the trial court and its opportunity and that of the jury to pass upon the credibility of the witnesses, the action of the trial judge "should not be disturbed unless it clearly and unequivocally appears there was a manifest denial of justice under the law." *Hartpence v. Grouleff*, 15 *N. J.* 545, 549 (1954).

█ The damages chargeable to a wrongdoer are, of course, limited to those injuries which are shown to be the natural and proximate effects of his wrongful acts; ordinarily, however, the determination of those injurious results which are

natural and proximate, as distinguished from those unrelated and remote, is exclusively the function of the jury. Further, as was said in *Moore v. Public Service Coordinated Transport,* 15 *N. J. Super.* 499, 504, 510 (*App. Div.* 1951):

"*   *   * having identified from the believable evidence such natural and proximate consequences, the admeasurement of the amount of pecuniary compensation is, within reasonable limits and instructions, assigned to the judgment and sound discretion of the jury. Unless there are applicable statutory standards, the law does not assume that a particular bodily injury calls for a definite amount of compensation. Here again the amount to be awarded is therefore primarily for the jury to estimate in view of the facts and circumstances of each particular case.
*      *      *      *      *      *      *      *
*   *   * It is axiomatic that the admeasurement of compensatory damages in actions for the injurious consequences of personal torts is not gauged by any established graduated scale."

Plaintiff's left hand played an important role in the surgery practiced by him. Strength in his left hand was requisite to the skill with which he was able to perform radical operations in the abdomen and pelvis and the operations for relief of high blood pressure according to the special technique he originated necessitated a delicacy of finger touch. He was en route to the operating room to perform a high blood pressure operation when he suffered the mishap. His injuries were primarily to his left hand. He suffered a comminuted fracture of the left radius and the tearing of the ligaments of his left wrist with a consequent deformity and stiffness of the wrist, leaving him with a limited function thereof both in rotation and bending. There was also a partial atrophy of the thumb muscles. These injuries, permanent in nature, have left him with a weakened grip and loss of power in his left hand, and also have impaired the delicacy of finger touch which he had before the accident. He was wholly disabled from performing any operations from the date of the accident, June 10, 1953, until September 17, 1953, and during most of that time his hand and arm were in casts. He attempted some operations after that date, but, by March of 1954, was forced to recognize that

the permanently lessened strength and reduced mobility of his left hand meant that he must be wary of performing operations for the success of which a strong left hand is essential; he must be conscious, he said, that, "Mind you, you have a life at stake. You are not simply using a mechanical toy or machine that you can try this or try that on. You are obligated to get that patient home alive and not traumatize him." "It was not until March that I knew how far I could go with my left hand and still have a live patient. From that time on I limited my work to a certain type and phase." And the reduced sensitivity in his left hand has also impaired his ability to employ the special technique developed by him to relieve high blood pressure. To maintain his income he now emphasizes the general practice of medicine but has not realized gross earnings as large as those earned before the accident in his surgical practice. Moreover, he still suffers severe pain in his arm and wrist when using them, whether in the operating room or elsewhere.

The jury could reasonably find upon these proofs that plaintiff's useful career as a surgeon has been materially foreshortened (he is 54 years old) and that this will mean a substantial diminution in his earnings. In any event, we cannot say, as we must if we are to reverse the action of the trial judge under the standard governing appellate review, that this verdict, in the circumstances, though large, irresistibly gives rise to the inference that there was a manifest denial of justice to the defendant.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices WACHENFELD, JACOBS and BRENNAN—4.

*For reversal*—Justice OLIPHANT—1.