EMMA R. LOKAR AND JOSEPH J. LOKAR, HER HUSBAND, PLAINTIFFS-APPELLANTS, v. CHURCH OF THE SACRED HEART, MT. EPHRAIM, NEW JERSEY, A RELIGIOUS CORPORATION OF NEW JERSEY, DEFENDANT-RE-SPONDENT.

Argued June 3, 1957—Decided June 24, 1957.

*Mr. Frank M. Lario* argued the cause for the appellants.

*Mr. Carl Kisselman* argued the cause for the respondent (*Messrs. Orlando, Kisselman & Devine,* attorneys).

The opinion of the court was delivered by

HEHER, J.  We certified here on our own motion plaintiffs' pending appeal to the Appellate Division of the Superior Court from a judgment of involuntary dismissal of the action at the close of plaintiffs' case, entered in the Camden County Court, Judge Martino sitting, for failure of proof of the pleaded negligence in the use of defendant's church premises situate in Mount Ephraim on the Black Horse Pike, and also on the ground of defendant's immunity from suit as an "eleemosynary corporation."

Plaintiff Emma R. Lokar fell February 8, 1953 as she proceeded along a driveway on defendant's church lands toward the abutting highway to which it led, after attending the eleven o'clock Mass, and sustained injuries for which her husband also sues *per quod.*  The driveway was "blocked off" to vehicular traffic by a chain approximately two inches in diameter, suspended across the width of the driveway from a post at either end, at an elevation permitting a crossover by passersby.  By this means the driveway was barred to automobiles on Sunday mornings and whenever there was occasion for the measure.  The closing of the driveway was at the behest of the local bureau of police, "because it was a traffic hazard."  The driveway was paralleled by a "walk" extending along the church building between the front and rear entrances; the driveway and walk were connected by a cement path near the rear entrance to the church building, and by a flagstone way at the front, and there was a grass plot between.

Until the advent of the barrier the church premises were used for the parking of automobiles, driven from the high-

way *via* the driveway; the pastor had made known from the pulpit the discontinuance of the practice and the use of the chain to close the way, and Mrs. Lokar acknowledged on the witness stand that she had heard the pulpit announcement and was aware of the nature of the barrier and its purpose "more than several months" before the mishap befell her; she had "used" the driveway "to walk up to the flagstone walk" "just as much as the sidewalk along the church."

On the particular occasion Mrs. Lokar "left the church by the back entrance," "came down the steps, following others"; the "walk along the church was filled"; she "walked down the driveway with the other people" toward the highway (her husband had gone ahead for the car parked nearby), "veering to the left to go over to [the] walk"; she "veered with the people that were walking to the left also," intending to cross over to the walk alongside the church building, and there wait for her husband, and while so engaged the "chain hit the front part of my both ankles," "on the front of both of my ankles"; it "swung and it was heavy, there was an impact," and she "went flat on the cement"; the chain "was stretched across the driveway"; a "young person" she could not identify "almost fell"; she saw "her heel," the "heel caught, and the chain swung," but she "didn't fall." Mrs. Lokar was "very close" to the chain when she "was hit"; she was not seeking to step over the chain "when she was struck"; she "never went over the chain"; she and her husband always left the church by the "rear" door. They had been members of the parish for more than 14 years.

■■ We are concerned here with the standard of conduct as to others laid upon the possessor of land; and this, in turn, depends on the existence of a relation between the particular parties requiring the protection of the one by the other against what the law by common consent deems an unreasonable risk of harm, and whether the evidence in this regard involves issues of fact subject to diverse judgments by reasonable men. Is negligence, measured by the accepted rule of conduct, a permissible conclusion in any reasonable view of the evidence? If it is, then there is a

question for the jury. The inquiry is whether there is any evidence which, if accepted and given its fullest probative force, reasonably tends to sustain the pleaded cause of action. Is it such that fair and reasonable men would be justified in concluding that the burden of proof had been sustained? Mere surmise or conjecture is not enough. *Sivak v. City of New Brunswick*, 122 *N. J. L.* 197 (*E. & A.* 1939). See also, *Leers v. Green*, 24 *N. J.* 239 (1957).

It was early declared to be the rule in New Jersey that an "owner of lands who, by invitation, express or implied, induces persons to come upon his premises, is under a duty to exercise ordinary care to render the premises reasonably safe for such purposes, or at least to abstain from any act that will make the entry upon or use of the premises dangerous." *Phillips v. Library Co.*, 55 *N. J. L.* 307 (*E. & A.* 1893). See *Murphy v. Core Joint Concrete Pipe Co.*, 110 *N. J. L.* 83 (*E. & A.* 1933); *Griffin v. De Geeter*, 132 *N. J. L.* 381 (*E. & A.* 1945); *Beck v. Monmouth Lumber Co.*, 137 *N. J. L.* 268 (*E. & A.* 1948); *Gudnestad v. Seaboard Coal Dock Co.*, 15 *N. J.* 210 (1954). An act in disregard of the possessor's duty of care in the use of the land, in proportion to the foreseeable risk, is a remediable tortious transgression. *Strang v. South Jersey Broadcasting Co.*, 9 *N. J.* 38 (1952). One who "by invitation, express or implied, induces persons to come upon his premises," as distinguished from an entry by mere license or sufferance, owes to the invitee the duty to exercise "ordinary care to render the premises reasonably safe" for the intended use, and to abstain from any act that would make the use dangerous. *Taneian v. Meghrigian*, 15 *N. J.* 267 (1954).

But on reason and authority there is no obligation, save in exceptional circumstances, to use the words of Dean Prosser, "to protect the invitee against dangers which are known to him, or which are so apparent that he may reasonably be expected to discover them and be fully able to look out for himself"; "Ordinarily nothing more than a warning is required." *Prosser, Law of Torts* (2d ed. 1955), *section 78.* See *Burk v. Walsh*, 118 *Iowa* 397, 92 *N. W.* 65 (*Sup.*

*Ct.* 1902) ; also *Keeton, "Personal Injuries Resulting from Open and Obvious Conditions"* (1952), 100 *U. Pa. L. Rev.* 629 (1952).

The principle has general acceptance. A possessor of land is not subject to liability to his "licensees, whether business visitors or gratuitous licensees," for bodily harm caused to them by "any dangerous condition thereon, whether natural or artificial, if they know of the condition and realize the risk involved therein." *Restatement, Torts, section* 340. *Section* 332 defines a "business visitor" as a person who is "invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them," and thus an invitee in the usual sense of the term.

The possessor of land is not liable to one rightfully on the premises for injuries attributable to dangers that are obvious or as well known to the user of the lands as to the possessor.

"The true ground of liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and not known to the person injured that a recovery is permitted. * * *" *Pinehurst Co. v. Phelps,* 163 *Md.* 68, 160 *A.* 736 (*Ct. App.* 1932).

The principle was applied in the later case of *Gordon v. Maryland State Fair,* 174 *Md.* 466, 199 *A.* 519 (*Ct. App.* 1938), where a patron of a race track was denied damages for injuries suffered at the hands of a surging crowd. See also 65 *C. J. S., Negligence,* § 74.

Here, the injured plaintiff was aware of the barrier; there was due notice of its existence to all the parishioners; she did not intend to step over the chain; she had never done so; it was not *per se* a dangerous agency on the land; her fall came from another's ill-use of what was designed to be an obstruction to vehicular passage for the safety of all against such hazards, including the plaintiff herself, and certainly it was not so erected or arranged as to invite foot

passage over the chain itself. On the showing made, the accident was the result of the intervening act of another pedestrian. But we have no occasion to inquire into the principle of intervening causes, foreseeable and unforeseeable, normal incidents of the risk, or contributory negligence and assumption of risk; it suffices to say that defendant was plainly not guilty of negligence which proximately contributed to the pleaded injury. Compare *Morril v. Morril,* 104 *N. J. L.* 557 (*E. & A.* 1928) ; *Taylor v. Kelvin,* 121 *N. J. L.* 142 (*E. & A.* 1938).

Analogy may be found in the revolving- and swinging-door cases.

"Swinging doors in buildings and stores are installed and maintained for the accommodation of those who have occasion to enter such buildings. The operation of such doors is not within the exclusive control of the owner of the building or proprietor of the store. Customers and patrons take a very distinct part in their operation and are chargeable with the exercise of ordinary care in their use. Injury may occur in their operation from a lack of such care on the part of the persons who use them, and for whose negligence the owner or proprietor would be in no wise responsible." *Olson v. Whitthorne & Swan,* 203 *Cal.* 206, 263 *P.* 518, 58 *A. L. R.* 129 (*Sup. Ct.* 1928).

See also *S. S. Kresge Co. v. Fader,* 116 *Ohio St.* 718, 158 *N. E.* 174 (*Sup. Ct.* 1927) ; *Annotation,* 58 *A. L. R.* 132.

There is no suggestion here that the particular device was defective, or was ill-adapted to the purpose in view of protection against the hazards of vehicular use of the driveway, or was in anywise short of the generally accepted standard in such cases. The possessor of the land would be justified in assuming, after warning given, that those who came upon the land would know of the barrier and the risk of foot passage across the chain and govern themselves accordingly. Compare *Bianchi v. South Park Presbyterian Church,* 123 *N. J. L.* 325 (*E. & A.* 1939). The possessor of land is not an insurer of the safety of those who are there by his invitation or leave.

Affirmed.

JACOBS, J. (dissenting). On Sunday, February 8, Mrs. Lokar and her husband attended the eleven o'clock Mass at the Church of the Sacred Heart in Mt. Ephraim. At twelve o'clock she, along with the other parishioners, left by way of a side door which led to a narrow sidewalk and a wide driveway, each paralleling the church structure. She testified that "the sidewalk was filled with people" and that she "followed with the crowd" along the driveway. When she approached the chain which had been placed at the entrance of the driveway to prevent vehicular traffic, she veered towards the sidewalk and had no intention of stepping over the chain. Although she and the other parishioners had customarily used the driveway for exit purposes, she "never went over the chain" for she had seen "too many accidents happen" at that spot when people had jumped over the chain and had fallen. A young girl in front of her did jump over the chain, caught the heel of her shoe in it and caused it to swing and strike Mrs. Lokar's ankles. The impact from the heavy chain knocked Mrs. Lokar to the ground, with resulting injuries of serious nature. Mr. Lokar did not see the accident since he had gone for his car and was to meet Mrs. Lokar in front of the church; however, he did testify as to various matters within his own knowledge. In response to an inquiry as to how long the chain had been there he said, "I think that chain has been there quite a while, but it has been off and on, sometimes it is pulled tighter than the other times, and the chain is too low."

Rev. Philip T. Rigney, Vice-Chancellor of the Diocese of Camden, testified that under a "prescription in Canon Law, a member of the Catholic Church may not sue the Catholic Church without permission of the Bishop." The Lokars requested and received such permission; the letter of permission was signed by Father Rigney in accordance with authority given to him. Rev. M. Augustine Crine, pastor of the Church of the Sacred Heart, acknowledged that the use of the side door for exit purposes facilitated "the emptying of the church"; that he had seen the chain taken off so that people could walk by; and that when the chain was

removed the exit was "faster and easier." He stated that "the sexton of the church usually looked after this chain"; that he never had any one supervising the exit from the church; and that "since the driveway was not used as a driveway any more, there were no regulations concerning walking there."

When the plaintiffs originally filed their complaint they sought damages in the aggregate sum of $35,000. They evidently learned thereafter that the liability insurance policy which the defendant carried had a $10,000 limit. They served notice of application for leave to amend their complaint, by reducing their demand for damages to $10,000, and to file a reply setting up an estoppel against the defendant's assertion that since it was an eleemosynary corporation it was exempt from any liability to the plaintiffs. The trial court permitted the reduction in the demand for damages but denied the application for leave to set up an estoppel. The complaint was duly amended to claim the aggregate sum of $10,000 and the matter went to trial. At the close of the plaintiffs' case the trial judge granted the defendant's motion for involuntary dismissal, stating that he had "grave doubt" as to whether there was sufficient evidence of negligence and that the defendant, as an eleemosynary institution, had total immunity from tort responsibility to the plaintiffs.

At the end of the plaintiffs' case they were admittedly entitled to have the benefit of all of the favorable inferences which the jury might reasonably have drawn from their testimony. *Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454, 459 (1956); *O'Donnell v. Asplundh Tree Expert Co.,* 13 *N. J.* 319, 328 (1953). The jury could readily have found that at the time of the accident the chain was not taut but was loosely hinged; that in such condition it represented a real danger to the concentrated group of parishioners leaving the church by way of the driveway; and that, notwithstanding earlier accidents, no steps whatever had been taken to remove the chain, or to keep it taut, or to prescribe regulations, or to exercise supervision when parishioners permissibly used the driveway for exit purposes.

On such finding there would be adequate basis for the conclusion that injury, either in the manner described by Mrs. Lokar or in some other manner, was reasonably foreseeable, and that in not taking suitable precaution against it there had been a failure to exercise due care. The fact that the chain was set in motion by the unknown parishioner was not significant; indeed, it was the very sort of thing which the jury could find should have been anticipated and guarded against. See *Menth v. Breeze Corporation, Inc.,* 4 *N. J.* 428, 440 (1950). And the fact that Mrs. Lokar may have known of the danger in stepping over the chain was not significant, for she had no intention of doing so; in any event, the knowledge on her part would seemingly bear on the issues of assumption of risk and contributory negligence which, though raised by the pleadings, were not discussed in the briefs before this court and are ordinarily permitted to rest with the jury. See *Taylor v. New Jersey Highway Authority, supra,* 22 *N. J.,* at *page* 466. Since I entertain the view that the plaintiffs' evidence of negligence was sufficient to call for the defendant's defense, I come to the more important question of whether the defendant, as an eleemosynary institution, had an absolute immunity from tort responsibility to the plaintiffs.

In *Heaven v. Pender,* [1883] 11 *Q. B.,* 503, 509, the court expressed the general rule of negligence in the following well-known language:

"whenever one person is placed by circumstances in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."

Although this enlightened principle of due care is admittedly taking hold more and more, it still comes into conflict with the various special immunities which supposedly must rest upon their own historical and social justifications. Historically the tort immunity of charitable institutions (including churches, hospitals, etc.) has little basis. In *Holliday v.*

*St. Leonard, Shoreditch,* 11 *C. B.* (*N. S.*) 192, 142 *Eng. Rep.* 769 (1861), the court, following the *dictum* in *Duncan v. Findlater,* 6 *Clark & F.* 894, 7 *Eng. Rep.* 934 (1839), did hold the vestry of a parish to be immune from tort responsibility, but this holding was quickly overturned. See *Mersey Docks Trustees v. Gibbs, L. R.* 1 *H. L.* 93, 11 *Eng. Rep.* 1500 (1866); *Foreman v. Mayor of Canterbury, L. R.* 6 *Q. B.* 214 (1871). When, in *McDonald v. Massachusetts General Hospital,* 120 *Mass.* 432 (1876), the issue was first presented in the United States, the court held that a hospital was immune from tort responsibility, but it relied entirely on the *Holliday* case, not recognizing that it had already been overruled. See *Goodhart, "Hospitals and Trained Nurses,"* 54 *L. Q. Rev.* 553, 559 (1938). Other American courts followed *McDonald,* and it was not until after 1942, when Justice Rutledge delivered his devastating opinion in *President and Directors of Georgetown College v. Hughes,* 76 *U. S. App. D. C.* 123, 130 *F.* 2d 810 (*D. C. Cir.* 1942), that a substantial number of them, now fully aware of the historical error and the lack of current utility or justification for the immunity, rejected it *in toto.* See *Bing v. Thunig* (*St. John's Episcopal Hospital*), 2 *N. Y.* 2d 656, 163 *N. Y. S.* 2d 3, 143 *N. E.* 2d 3 (1957); *Avellone v. St. John's Hospital,* 165 *Ohio St.* 467, 135 *N. E.* 2d 410 (1956); *Wheat v. Idaho Falls Latter Day Saints Hospital, Idaho,* 297 *P.* 2d 1041 (1956); *Noel v. Menninger Foundation,* 175 *Kan.* 751, 267 *P.* 2d 934 (1954); *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 *Wash.* 2d 162, 260 *P.* 2d 765 (1953); *St. Lukes Hospital Ass'n v. Long,* 125 *Colo.* 25, 240 *P.* 2d 917, 31 *A. L. R.* 2d 1120 (1952); *Moats v. Sisters of Charity of Providence,* 13 *Alaska* 546 (1952); *Durney v. St. Francis Hospital,* 7 *Terry* 350, 46 *Del.* 350, 83 *A.* 2d 753 (1951); *Ray v. Tucson Medical Center,* 72 *Ariz.* 22, 230 *P.* 2d 220 (1951); *Malloy v. Fong,* 37 *Cal.* 2d 356, 232 *P.* 2d 241 (1951); *Haynes v. Presbyterian Hospital Ass'n,* 241 *Iowa* 1269, 45 *N. W.* 2d 151 (1950); *Foster v. Roman Catholic Diocese of Vermont,* 116 *Vt.* 124, 70 *A.* 2d 230, 25 *A. L. R.* 2d 1 (1950);

*Tavarez v. San Juan Lodge No. 972, B. P. O. E.,* 68 *Porto Rico* 681 (1948); *Rickbeil v. Grafton Deaconess Hospital,* 74 *N. D.* 525, 23 *N. W. 2d* 247, 166 *A. L. R.* 99 (1946). *Cf. Porto Rico Gas & Coke Co. v. Frank Rullan & Associates,* 189 *F. 2d* 397 (1 *Cir.* 1951); *Brigham Young Univ. v. Lillywhite,* 118 *F. 2d* 836, 137 *A. L. R.* 598 (10 *Cir.* 1941); *Tuengel v. City of Sitka, Alaska,* 118 *F. Supp.* 399 (*D. C. D. Alaska* 1954); *Mississippi Baptist Hospital v. Holmes,* 214 *Miss.* 906, 55 *So. 2d* 142, 56 *So. 2d* 709, 25 *A. L. R. 2d* 12 (1951); *Nicholson v. Good Samaritan Hospital,* 145 *Fla.* 360, 199 *So.* 344, 133 *A. L. R.* 809 (1940); *Gable v. Salvation Army,* 186 *Okl.* 687, 100 *P. 2d* 244 (1940); *Welch v. Frisbie Memorial Hospital,* 90 *N. H.* 337, 9 *A. 2d* 761 (1939); *Mulliner v. Evangelischer Diakonniessenverein,* 144 *Minn.* 392, 175 *N. W.* 699 (1920). See *Annotation,* "*Immunity of nongovernmental charity from liability for damages in tort,*" 25 *A. L. R. 2d* 29 (1952).

The most recent rejection of the immunity was the 1957 decision in *Bing v. St. John's Episcopal Hospital, supra,* which held that a hospital was not immune from tort liability for its negligent injury of a patient. *Cf. Roland v. Catholic Archdiocese of Louisville, Ky.,* 301 *S. W. 2d* 574 (1957). The Court of Appeals, in a refreshingly forthright opinion by Judge Fuld, rejected the patently illogical distinctions which had been made in earlier New York decisions and discarded the immunity doctrine as being "at variance with modern-day needs and with concepts of justice and fair dealing." In 1956 the Supreme Court of Ohio and in 1953 the Supreme Court of Washington reached similar conclusions in full opinions which pointed out, *inter alia,* that since liability insurance was available to charitable institutions they were hardly in a position to urge realistically that their subjection to ordinary tort responsibility for their wrongdoing might endanger the continuance of their highly worthy endeavors. See *Pierce v. Yakima Valley Memorial Hospital Ass'n, supra; Avellone v. St. John's Hospital, supra.* But *cf. Lyon v. Tumwater Evangelical Free Church,* 47 *Wash. 2d* 202, 287 *P. 2d* 128 (1955),

criticized in *Westberg, "The Questionable Status of the Charitable Immunity,"* 31 *Wash. L. Rev.* 287 (1956). See *Morris, "Sequelae of Recent Hospital Tort Liability,"* 6 *Clev.-Mar. L. Rev.* 47 (1957); *Brannon, "Hospital Immunity,"* 6 *Clev.-Mar. L. Rev.* 243 (1957). In 1950 the Supreme Court of Vermont, in *Foster v. Roman Catholic Diocese of Vermont, supra,* held that the defendant was not immune from tort responsibility to a parishioner who was injured when she fell on the church sidewalk; in the course of his opinion for the court, Justice Adams stressed the differences between 19th Century conditions when the immunity was first judicially embraced and present-day conditions:

"Private charities are much different now than when the liability question was first before the courts. Then they were largely small institutions, many connected with churches, and of limited means. Today they have become, in many instances, big businesses, handling large funds, managing and owning large properties and set up by large trusts or foundations. It is idle to argue that donations for them will dry up if the charity is held to respond for its torts the same as other institutions or that the donors are giving the funds or setting up large foundations for charitable purposes with the expectation that the charities they benefit will not be responsible like other institutions for negligent injury."

When we turn to professorial and student writings we find almost universal opposition to the immunity. See 2 *Harper & James, Torts* 1667 (1956); *Prosser, Torts (2d ed. 1955), 784; Pound, "Some Thoughts about Stare Decisis,"* 13 *N. A. C. C. A. L. J.* 19, 23 (1954); *Thornton and McNiece, "Torts,"* 32 *N. Y. U. L. Rev.* 312, 327 (1957); *Appleman, "Tort Liability of Charitable Institutions,"* 22 *A. B. A. J.* 48 (1936); *Annotation,* 25 *A. L. R. 2d* 29, 42 (1952), and the numerous law review discussions listed there. Although these writings are free from the restraints of judicial responsibilities, they are worthy of careful consideration for they embody thoughtful and high-minded endeavors to stimulate the movement of our law towards the ever-present goal of obtaining a higher measure of justice for all people. Almost a quarter of a century ago Professor Harper expressed the policy views which have been long

entertained by legal scholars and have been strongly re-enforced by the passage of time:

"the immunity of charitable corporations in tort is based upon very dubious grounds. It would seem that a sound social policy ought, in fact to require such organizations to make just compensation for harm legally caused by their activities under the same circumstances as individuals before they carry on their charitable activities. The policy of the law requiring individuals to be just before generous seems equally applicable to charitable corporations. To require an injured individual to forego compensation for harm when he is otherwise entitled thereto, because the injury was committed by the servants of a charity, is to require him to make an unreasonable contribution to the charity, against his will, and a rule of law imposing such burdens cannot be regarded as socially desirable nor consistent with sound policy." *Harper, Law of Torts*, § 294, *p.* 657 (1933).

The tort liability of a private charitable institution was first passed upon in New Jersey in *D'Amato v. Orange Memorial Hospital,* 101 *N. J. L.* 61 (*E. & A.* 1925). The plaintiff Elizabeth D'Amato had been a patient at the Orange Memorial Hospital and brought an action, for damages against the hospital, alleging that she was injured as the result of the negligence of a nurse employed at the hospital. The Court of Errors and Appeals held that the hospital was immune from tort responsibility to the plaintiff; it relied largely on the "leading case" of *Schloendorff v. Society of New York Hospital,* 211 *N. Y.* 125, 105 *N. E.* 92, 52 *L. R. A., N. S.,* 505 (1914), which has since been overruled (*Bing v. St. John's Episcopal Hospital, supra*), and *McDonald v. Massachusetts General Hospital, supra,* which, as has been so often pointed out, followed an overturned English precedent. The only ground advanced in *D'Amato* in support of its holding was the brief statement by Chancellor Walker that "public policy requires that a charitable institution maintaining a hospital be held not liable for injuries resulting to patients through the negligence or carelessness of its physicians and nurses, even if the injured person were a pay patient—payment for board, medical services and nursing in such case going to the general fund to maintain the charity." See 101 *N. J. L.,* at

*page* 65. But the Chancellor did not document his expression of public policy, nor did he discuss the underlying reasons for the court's conclusion that it should then declare the immunity. *Cf. Haynes v. Presbyterian Hospital Ass'n, supra*:

"The law's emphasis generally is on liability, rather than immunity, for wrongdoing. Charity is generally no defense. It is for the legislature, not the courts, to create and grant immunity. The fact that the courts may have at an early date, in response to what appeared good as a matter of policy, created an immunity, does not appear to us a sound reason for continuing the same, when under all legal theories, it is basically unsound and especially so, when the reasons upon which it was built, no longer exist."

In *Boeckel v. Orange Memorial Hospital,* 108 *N. J. L.* 453 (*Sup. Ct.* 1932), affirmed 110 *N. J. L.* 509 (*E. & A.* 1933), the *D'Amato* case was applied to preclude recovery by Mrs. Boeckel (the mother of a patient at the Orange Memorial Hospital), injured when she fell on slippery hospital steps. But in *Kolb v. Monmouth Memorial Hospital,* 116 *N. J. L.* 118 (*E. & A.* 1936) the Monmouth Memorial Hospital was held under tort liability to Mr. Kolb (a member of the First Aid Squad of the Oakhurst Volunteer Fire Department), injured while he assisted in bringing a patient to the hospital. The court declined to apply *D'Amato* on the ground that Mr. Kolb was not a recipient of the hospital's "benefactions"; instead it applied *Simmons v. Wiley M. E. Church,* 112 *N. J. L.* 129 (*E. & A.* 1934), where a private charitable institution was held liable for injuries sustained by Mr. Simmons when he was struck on a public highway by a truck owned by the church and negligently driven by one of its employees. In the *Simmons* case the Court of Errors and Appeals held that the immunity doctrine announced in *D'Amato* must be confined to instances where the injured person is a so-called "beneficiary" of the charity, and may not be extended to instances where the person injured is a so-called "stranger." In *Rose v. Raleigh Fitkin-Paul Morgan, etc., Foundation,* 136 *N. J. L.* 553 (*E. & A.* 1948), the Court of Errors and Appeals held that a private nurse,

caring for a patient at the Fitkin Memorial Hospital, could properly assert a tort claim against the hospital for injuries sustained by her at the hospital premises; she was viewed as a stranger within *Simmons* rather than a beneficiary within *D'Amato*. In *Lindroth v. Christ Hospital,* 21 *N. J.* 588 (1956), this court recently sustained a judgment which was recovered by the plaintiff doctor who suffered injuries as the result of the defendant's negligent failure to maintain the elevator at the hospital premises in proper working condition; here again the doctor was viewed as a stranger within *Simmons* rather than a beneficiary within *D'Amato*.

The lines being drawn by the New Jersey courts between strangers and beneficiaries are indeed confusing and are somewhat reminiscent of the decisions in New York which formerly differentiated between negligent administrative acts to which liability attached and negligent medical acts to which no liability attached. The New York courts found themselves holding that placing an improperly capped hot water bottle on a patient's body was administrative, whereas keeping a hot water bottle too long on a patient was medical; that administering blood to the wrong patient was administrative, whereas administering the wrong blood to the right patient was medical; that employing an improperly sterilized needle for a hypodermic injection was administrative, whereas improperly administering a hypodermic injection was medical; and that the failure to place sideboards on a bed after a nurse had decided they were necessary was administrative, while failing to decide that the sideboards should be used when the need did exist was medical. See *Bing v. St. John's Episcopal Hospital, supra.* In our own State there was one lower court decision (*Fields v. Mountainside Hospital,* 22 *N. J. Misc.* 72 (*Cir. Ct.* 1944)) which adopted the New York view and pronounced an exception to the *D'Amato* doctrine where there had been administrative negligence. But *cf. Jones v. St. Mary's Roman Catholic Church,* 7 *N. J.* 533, 538 (1951); *Woods v. Overlook Hospital Ass'n,* 6 *N. J. Super.* 47, 50 (*App. Div.* 1949); *Fair v. Atlantic City Hospital,* 25 *N. J. Misc.* 65, 70 (*Cir. Ct.* 1946).

Professor Scott has extensively discussed three possible grounds which have been suggested for the exemption of charitable institutions from tort liability. See 4 *Scoll, Trusts* (*2d ed.* 1956), 2894. The first is that where property is devoted to charitable objects it should not be diverted from those objects, and that payment of a tort claim would amount to such diversion. But this view would deny liability in all tort cases, including cases such as *Simmons, Kolb, Rose* and *Lindroth,* where recovery was allowed by the Court of Errors and Appeals and this court, and in any event it could have no application whatever where the institution's liability was fully covered by insurance. The second rests on an alleged waiver by the injured party; but such waiver would be wholly fictitious and a figment of the judicial imagination. The third rests on the inapplicability of the doctrine of *respondeat superior;* but adoption of this approach would deny liability in all tort cases, including cases such as *Simmons, Kolb, Rose* and *Lindroth,* and would seem to disregard the true ground for vicarious liability in our law. See *Harper & James, supra,* at 1669. The New Jersey decisions have not truly subscribed to any of the foregoing bases but have spoken almost exclusively in terms of the public policy as the judges then saw it. Thus, in the *Boeckel* case Justice Case, sitting in the former Supreme Court, recognized that the diversion of the charity's funds, if any, was the same whether the tort clamaint was a beneficiary or stranger but, after finding the plaintiff to be a beneficiary, applied *D'Amato* as the State's declaration of public policy. And in the *Kolb* case the court reaffirmed *D'Amato* as limited by *Simmons,* pointing out that it subscribed to "the public policy theory." See also *Bianchi v. South Park Presbyterian Church,* 123 *N. J. L.* 325, 332 (*E. & A.* 1939).

It may perhaps be that when *D'Amato* was rendered in 1925 it accurately represented the then prevailing notions of public policy. But times and circumstances have changed and I do not for a moment believe that it faithfully represents current notions of rightness and fairness. Due care

is to be expected of all, and when an organization's negligent conduct injures another there should, in all justice and equity, be a basis for recovery without regard to whether the defendant is a private charity. This seems particularly evident under the facts presented in the instant matter. The plaintiffs requested and obtained permission before they instituted their negligence action against the charity, and they have limited their claim for damages to the coverage of the insurance policy. Thus the charity is in no position to assert that there may be an impairment of its funds. Indeed, even the insurance company is in no position to assert ·that it may be unjustly affected, for it presumably obtained a full premium when it formally agreed in its policy that it would not "except with written consent of the insured, set up as a defense against claims for damages for bodily injuries as covered by this policy, the existence of any statute or rule of law whereby the insured by reason of its being a charitable or eleemosynary institution is legally exempt from liability for damages for bodily injuries incurred through negligence." *Cf. Wendt v. Servite Fathers,* 332 *Ill. App.* 618, 76 *N. E. 2d* 342 (1947). Judge Jayne recently expressed views which are much closer to the mores and ethical ideals of our times than are those which underlay *D'Amato* several decades ago:

"Causes of action such as this arise with some frequency in which the tort liability of the defendant for the payment of adequate compensatory damages would be apparently certain but for the circumstance that the defendant is a charitable institution and its immunity is expressly pleaded in its defense. The exoneration of such defendants from normal liability doubtless occasions the courts in many extreme cases to blush.

Here, for example, it is alleged that the hospital nurse negligently caused the child to fall from the crib resulting in consequent permanent injuries to the child of a nature which would excite the profound sympathies, if not the natural indignation, of everyone. Yet the existing principle of law denies the child a right to recover from the institution any pecuniary damages whatsoever. Such cases naturally draw in question the wisdom of the legal principle.

It seems doubtful that the unqualified immunity rule of which we speak has any place today in the jurisprudence of any country except America. Numerous have been the scholarly articles advo-

cating the elimination of the immunity. Certainly since the advent of liability insurance in such wide fields, the trend of the more recent decisions is toward the abandonment of the rule, especially where the court was unfettered by a chain of precedents. Appropriate insurance covering the negligence and individual liability of employees and servants could probably be imperatively required of such charitable institutions by statute." *Rafferzeder v. Raleigh, etc., Memorial Hospital*, 33 *N. J. Super.* 19, 22 (*App. Div.* 1954).

The trend towards judicial rejection of the policy notions which brought about the immunity rule has indeed been pronounced. The very recent opinions by the Court of Appeals of New York in 1957, the Supreme Court of Ohio in 1956, the Supreme Court of Kansas in 1954 and the Supreme Court of Washington in 1953, embody full discussions of the compelling reasons which led them to discard the immunity rule as being out of tune with our times. But *cf. Lyon v. Tumwater Evangelical Free Church, supra.* Earlier cases were collected in the annotation in 25 *A. L. R.* 2*d* 29, where the author summarized the various reasons which have been advanced by the courts which now take the position that a private charitable organization is justly to be held responsible, to the same extent as are all other organizations, for the injurious consequences of their tortious conduct:

"In addition to the grounds relied upon in rejecting the specific theories in support of the immunity, the courts advocating abandonment of the immunity rule have pointed out that this rule found its way into the law through misconception or misapplication of previously established principles; that it is doubtful whether the administration of justice has ever been well served by the rule; that, in any event, the rule has become outmoded and is an anachronism; that it is a principle of law, as well as of morals, that men must be just before they are generous; that a charity should not be permitted to inflict injury upon some without the right of redress, in order to bestow charity upon others because the result would be to compel the victim to contribute to the charity against his will; that the law's emphasis generally is on liability, rather than immunity, for wrongdoing, and that, in particular, the modern tendency of the law is to shift the burden from the innocent victim to the community at large, and to distribute losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than to leave them wholly to be borne by those who sustained them; that immunity tends to

foster neglect while liability tends to induce care and caution; that all persons, organizations, and corporations stand on an equality before the law, and all should be bound alike or excused alike; that the charitable nature of a tortfeasor cannot place it beyond the law applicable to all; and that protection of life and limb by organized society is of greater importance to mankind than any species of charity and is superior to property rights." 25 *A. L. R. 2d,* at *page* 58.

The final item requiring mention turns on the contention that even though the former public policy notions have been strongly altered, the elimination of the immunity should be left exclusively to the Legislature. There is no doubt that the Legislature may at any time, if it so chooses, fix with finality the State's policy as to the immunity of charitable institutions from tort responsibility. But the Legislature has not done so and has not voiced approval of the judicially declared immunity though it has expressly legislated for immunities in other fields. See *Cloyes v. Delaware Tp.,* 23 *N. J.* 324, 331 (1957). The bald fact is that judges of an earlier generation declared the immunity because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation, in the absence of legislative guidance and in the full light of their own times, firmly reach a contrary conclusion they should be ready to discharge their judicial responsibilities in conformance with modern concepts. It must be borne in mind that we are not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts where the rule of *stare decisis* is admittedly limited. See *Pound, supra,* 13 *N. A. C. C. A. L. J.,* at 22; *Seavey, "Cogitations on Torts,"* 68 (1954); *Cowan, "Torts,"* 10 *Rutgers L. Rev.* 115, 119 (1955). With respect to the application of the rule of *stare decisis* on the particular issue before us Dean Pound had this to say:

"Again *stare decisis* has no legitimate application to doctrines of the law of torts built upon a mistaken foundation persisting in the books after that foundation has been undermined, which are

out of accord with general principles recognized today, so that if they are rejected the general law is clarified rather than unsettled. Such, for example, is the doctrine of immunity of charitable hospitals and like institutions. This immunity for wrong ran counter to general principles of the law. In this country it was based upon *dicta* in English cases which were rejected in England before taken over in the United States. It has been given up by the courts in twenty states but is adhered to still in twenty-six. Anomalies of this sort ought not to be protected by *stare decisis*." 13 *N. A. C. C. A. L. J.*, at 23.

See also Judge Fuld in *Bing v. St. John's Episcopal Hospital, supra*:

"The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that *stare decisis* compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a 'petrifying rigidity,' but to assure the justice that flows from certainty and stability. If instead adherence to the precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to surivive, and no principle constrains us to adhere to it. On the contrary, as this court, speaking through Judge Desmond in *Woods v. Lancet* (303 *N. Y.* 349, 355, 102 *N. E.* 2d 691, 27 *A. L. R.* 2d 1250) declared, we would be abdicating 'our own function, in a field peculiarly non-statutory,' were we to insist on legislation and 'refuse to reconsider an old and unsatisfactory court-made rule.'"

The primary function of the law is justice, and when a principle of the law no longer serves justice it should be discarded. Here the law was embodied, not in any statute, but in a judicially declared tort principle of the common law. The acknowledged greatness of the common law has been its ability to develop and grow and to adapt and conform itself to current needs. *State v. Culver*, 23 *N. J.* 495, 505 (1957); *Carroll v. Local No. 269, etc., Electrical Workers*, 133 *N. J. Eq.* 144, 148 (*Ch.* 1943). Conscientious courts always must remain ready to reconsider common law doctrines and revise them if necessary. In *Loudon v. Loudon*, 114 *N. J. Eq.* 242 (*E. & A.* 1933), the Court of Errors and Appeals rejected a long-standing common law doctrine which it found "despite its tradition and universality, was never justified and should not be followed." And since the

creation of our new judicial structure under the Constitution of 1947 this Supreme Court has shown even greater awareness of the need for re-examining and restating common law doctrines which fail to meet modern social and moral concepts. See *State v. Culver, supra* (per Vanderbilt, C. J.); *Murphy v. Kelly*, 15 *N. J.* 608, 612 (1954) (per Wachenfeld, J.); *Saco v. Hall*, 1 *N. J.* 377, 383 (1949) (per Oliphant, J.). *Cf. Stoffer, "The Supreme Court and Stare Decisis,"* 9 *Rutgers L. Rev.* 1–15 (1954). It seems evident to me that the judicial doctrine affording immunity to private charitable institutions from ordinary tort responsibilities has no proper place in today's society and should now be eliminated. Accordingly, I would reverse and remand the cause for trial below.

Justice WEINTRAUB joins this dissent.

WACHENFELD, J. (concurring). [1, 2] I agree with Mr. Justice HEHER that plaintiffs' evidence was insufficient to warrant referring this case to the jury for its determination. The chain across the driveway was inherently an innocuous instrumentality, employed for the legitimate purpose of precluding access by automobiles and placed in position only after notice had been given. It was not defective or substandard in any respect, and Mrs. Lokar was fully cognizant of its presence. Under these circumstances, I am unable to discover any basis for an inference of negligence.

In our society, the concept of fault still predominates and not every injury entails liability. The church did not fail in its duty to exercise reasonable care for the safety of Mrs. Lokar.

But despite the fact that I am in concert with the majority as to the lack of adequate proof, I am constrained to go further and to express my approval of Mr. Justice JACOBS' views concerning the doctrine of charitable immunity. The forceful and sustained demands for its abolishment, emanating from almost every quarter, are a strong indication that its demise is well overdue. Even the charities themselves are by no means universally content with their pro-

tected status, and this uneasiness is reflected in the provisions of the policy here involved. It is common to specify that the insurer may not invoke the defense of immunity without permission from the insured charity.

Whether or not the doctrine originally gained a foothold in this country through mistaken adherence to outmoded English precedent, it would seem that under modern conditions there is little theoretical or pragmatical justification for its continued recognition. The barrier of immunity has been lowered on many fronts. It is a fundamental principle of humane and civilized justice that a wrongful injury should not go unrequited when redress is possible. The development of a comparatively inexpensive and convenient method of spreading the risk has obviated the threat that recoveries against charities will seriously deplete their funds and thereby deprive the community at large of the benefits which they bestow.

Experience in other jurisdictions has already demonstrated that no calamitous social effects result from a dissolution of charitable immunity. An individual should not be forced to suffer the unmitigated and ofttimes crushing burden of injuries wrongfully inflicted merely to continue a judicially inspired immunity long since outdated by the impact of modern times.

In my view of the case; any expression relating to the doctrine of charitable immunity is pure *dictum,* but this concurrence will serve to indicate the trend of my thoughts should it become an issue requiring decision.

WACHENFELD, J., concurring in result.

*For affirmance*—Justices HEHER, OLIPHANT, WACHENFELD and BURLING—4.

*For reversal*—Justices JACOBS and WEINTRAUB—2.